

**Robert E. Chudakoff**
*Partner*

DIRECT  216.583.7126
DIRECT FAX  216.583.7127
EMAIL  rchudakoff@ulmer.com

November 30, 2017

**VIA ECF (Redacted) AND FAX (Unredacted)**
*(Fax #(212) 805-7949)*

The Honorable P. Kevin Castel
United States District Judge
United States Courthouse
500 Pearl Street
New York, New York 10007-1312

Re:     *Dependable Sales & Service, Inc., et al. v. TrueCar, Inc.*
         Case No. 15-CV-1742 (PKC)
         Next Scheduled Case Management Conference: Dec. 7, 2017 at 11:00 a.m.

         **Plaintiffs' Response to Defendant's Pre-Motion Letter Regarding Summary
         Judgment and *Daubert* Expert Issues**

Dear Judge Castel:

We represent the automobile dealership Plaintiffs in this case.  Pursuant to Your Honor's
Individual Practice Rule 4.A., this letter responds to Defendant TrueCar, Inc.'s November 22,
2017 pre-motion letter, which covers two issues: (1) TrueCar's proposed motion for summary
judgment; and (2) TrueCar's proposed motion to strike Plaintiffs' damages expert under
*Daubert*.[1]  As to summary judgment, there are numerous genuine issues of material fact
precluding summary judgment on the cited topics.  As to the *Daubert* motion, Plaintiffs'
damages experts' credentials are well-established and their methodology is sound.  TrueCar
can attempt to rebut this testimony at trial through cross-examination and through its own
damages rebuttal expert.  Plaintiffs address these issues as follows.

**I.     TrueCar's Motion for Summary Judgment Would Be Futile in Light of the Factual
         Issues Underlying Plaintiffs' Claims**

This case is a civil action for false advertising and unfair competition brought by the Plaintiffs,
more than 100 automobile dealers throughout the U.S., against TrueCar.  Plaintiffs' causes of
action are based on TrueCar's false and misleading ads directed to consumers claiming that
TrueCar provides a "no haggle" car-buying experience and that consumers can buy cars
through TrueCar's Certified Dealers at less than "factory invoice."  TrueCar argues that it should
be awarded summary judgment on both false claims challenged by Plaintiffs, namely, the "No-
Haggle" claim and the "Factory Invoice" claim.  Plaintiffs disagree.

---

[1] Plaintiffs filed a redacted version of this letter via ECF because it references documents and
testimony designated by TrueCar as "Confidential" under the Protective Order entered in this
case.  The unredacted version was sent to chambers via fax pursuant to Practice Rule I.A.ii.

1660 West 2ND Street
Suite 1100
Cleveland, OH 44113-1406

FIRM    216.583.7000          FAX    216.583.7001



The Honorable P. Kevin Castel
November 30, 2017
Page 2

The facts establish that TrueCar is a lead-generating service intended to divert consumers to TrueCar's network of "Certified Dealers."  TrueCar touted its ability to deliver "deep in funnel" car buyers to its Certified Dealers who would then pay a $299 commission[2] to TrueCar for each completed sale.  To accomplish this diversion, TrueCar's false ads enticed consumers to visit its website to receive a "No-Haggle" or "No Negotiation" purchasing experience.  To do so, consumers must register for and download a "Guaranteed Savings Certificate" for use at TrueCar's Certified Dealers.  The No-Haggle Claim is demonstrably false because TrueCar admitted it was false in its microprint website disclaimers, ▮▮▮▮▮▮ Redacted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[3]

Federal courts have developed a multi-factor test for pleading and proving a false advertising claim.  The Second Circuit's test is as follows: (1) defendant made a literally false or misleading misrepresentation; (2) the misrepresentation has deceived or is likely to deceive consumers; (3) the misrepresentation was material; (4) the misrepresentation was placed in interstate commerce; and (5) the plaintiff(s) has been or is likely to be injured as a result of the misrepresentation.  *See Merck Eprova AG v. Gnosis S.P.A.*, 760 F.3d 247, 255 (2d Cir. 2014).  Due to the fact-intensive nature of Plaintiffs' false advertising claims, summary judgment is often inappropriate.  *See, e.g., Mylan Pharmaceuticals, Inc. v. Procter & Gamble Co.*, 443 F. Supp. 2d 453 (S.D.N.Y. 2006) (material issues of fact precluded resolution on summary judgment of false drug advertising claim) (J. Castel).  As a result, TrueCar's anticipated motion is futile and will merely result in an extraordinary expenditure of the Court's time and the parties' resources.

### A.    The Challenged Claims are Unequivocally False and Misleading

Plaintiffs' false advertising claims were fully vindicated by documents produced pursuant to the Court's August 30, 2017 privilege ruling.  *See* Court's Minute Entry [non-document] dated 08/30/17.  In that ruling, the Court rejected TrueCar's attorney-client privilege claims involving communications between TrueCar's counsel and its outside ad agencies.  Those documents, produced to Plaintiffs in September 2017, involved candid, unfiltered, and often contentious communications between three entities: (1) TrueCar's outside consultants, who were

---

[2]  Some Certified Dealers purportedly pay TrueCar on a subscription basis.  TrueCar's financial documents produced to Plaintiffs during discovery did not identify the payment models.

[3]  A January 2016 presentation to its Executive Committee acknowledges that Redacted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  TrueCar's market research produced during discovery showed that Redacted ▮▮▮▮▮▮▮▮▮▮.  A former TrueCar executive testified that ▮▮▮▮ Redacted ▮▮▮▮▮▮▮▮▮.  TrueCar's Redacted ▮▮▮▮▮▮▮ presents another genuine issue of material fact.



The Honorable P. Kevin Castel
November 30, 2017
Page 3

███████████████████████████████ Redacted ████████████████████████████████."
(2) TrueCar's in-house and outside counsel who ██████ Redacted ███████; and,
ultimately (3) TrueCar's CEO, who ████████████ Redacted ████████████████
████████████████████████████. With full knowledge of the legal risks, TrueCar's
then-CEO, Scott Painter, █████████████████ Redacted ██████████████████
██████. In fact, TrueCar went so far as to adopt the No Haggle Claim as its "positioning
statement" for the company.  Multiple email chains, along with the deposition testimony of
TrueCar's outside marketing agency and of its Chief Risk Officer at that time (and former
General Counsel), convey exactly what transpired and how █████████ Redacted ███████
████████████████████████████. Indeed, in one email the Chief Risk Officer plainly
advised the marketing agency: "██████████████████ Redacted ██████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████."'" (Emphasis
added.)

The documents also establish that TrueCar's counsel ███████████ Redacted █████████
██████. As Plaintiffs' damages expert testified, the Factory Invoice Claim was often woven into
TrueCar's ads featuring the No-Haggle Claim.  It was part of a graphic referred to as the "Price
Curve." This graphic conveyed the narrative that TrueCar's customers could buy a car for below
"factory invoice," which consumers understood to refer to the dealer's actual cost to purchase
the vehicle from the manufacturer.  Not surprisingly, TrueCar's own "Dealer Council" <sup>Redacted</sup>
█████████████████████ Redacted ██████████████████████████.

### B.    Plaintiffs Have Established Causation and Damages

TrueCar argues that summary judgment is appropriate because Plaintiffs cannot establish
causation or damages.  This argument is contradicted by the law and the facts.  As to the law,
plaintiffs in a false advertising case are not required to show but-for causation.  Indeed, it would
be impossible to determine what a consumer *would have done* "but for" viewing a defendant's
false ads.  As a result, courts have held that the "injury" standard for liability is "whether it is
likely that [defendant's] advertising has caused or will cause a loss of [plaintiff's] sales." *Church
& Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH*, 843 F.3d 48, 71 (2d Cir. 2016)
(quoting *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186 (2d Cir. 1980)).  This can be
established where plaintiff and defendant are competitors in a relevant market and plaintiff
demonstrates a "logical causal connection between the alleged false advertising and its own
sales position."  *Id.*  "At the liability stage, the Lanham Act 'demands only proof providing a
reasonable basis for the belief that the plaintiff is likely to be damaged as a result of the false
advertising.'"  *Id.* at 72 (quoting *Johnson & Johnson*).  Then, at the damages stage, the plaintiff
must prove (1) actual damages and (2) a causal link between those damages and the false
advertising.  *Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005,
1022 (S.D.N.Y. 1994).  (Plaintiffs discuss damages in Section II below.)



The Honorable P. Kevin Castel
November 30, 2017
Page 4

Numerous Plaintiffs have testified that they were damaged by TrueCar's false claim that it provides a "no-haggle" or "no-negotiation" car buying platform.  They testified that consumers would arrive at their non-TrueCar dealerships armed with TrueCar's so-called "Guaranteed Savings Certificate," requesting the dealers to sell the identified car at the identified "TrueCar Price."  What consumers did not know, however, was that the vehicle identified in the Certificate was a "virtual vehicle" that "⬛⬛⬛ Redacted ⬛⬛⬛."  They also did not know that TrueCar's co-founder and Chief Product Officer, Tom Taira, ⬛ Redacted ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛.[4]  This presented Plaintiffs with a choice: either attempt to honor the "⬛Redacted⬛ certificate" or lose the sale.  By attempting to honor the certificate, if it was artificially low (as they often were because they presented "virtual vehicles" lacking factory-standard options and equipment), Plaintiffs lost profits on the sale.  If the Plaintiffs could not honor it, they would lose a potential customer and all the profits associated with a sale, including post-sale profits.  Moreover, many Plaintiffs testified that they missed out on potential consumers who declined even to visit their dealerships because their in-market customers were diverted by TrueCar's false ads to TrueCar's out-of-market Certified Dealers.

TrueCar's letter argues that Plaintiffs cannot tie TrueCar's false No-Haggle and Factory Invoice ad claims to the diverted sales.  However, there is no dispute that consumers using TrueCar's service to purchase a car were exposed to TrueCar's false "No-Haggle" and "Factory Invoice" claims because they were required to visit TrueCar's website, which featured them.  The evidence establishes that its home page received more than ⬛Redacted⬛ unique page views *per month* during the challenged ad campaign.  ⬛⬛⬛ Redacted ⬛⬛⬛ its website's home page prominently displayed the "No-Haggle" claim.  This is unsurprising because discovery revealed that TrueCar's executives and marketing team sought to promote "No-Haggle" as the company's mission statement and its key differentiator in the market.  TrueCar's market research firm described "No-Haggle" as ⬛⬛⬛ Redacted ⬛⬛⬛⬛⬛.  The Court should decline TrueCar's invitation to rule, as a matter of law on summary judgment, that Plaintiffs' lost profits were not causally connected to TrueCar's No-Haggle and Factory Invoice advertisements and their resulting diversion of sales.

>        C.      The Record Shows that TrueCar's "No-Haggle" Claim was Material

TrueCar additionally argues that Plaintiffs' No-Haggle Claim must be dismissed on materiality grounds.  This argument similarly misses the mark.  An advertising claim is material for Lanham

---

[4] This is the same email in which co-founder and Chief Product Officer Taira stated that a ⬛⬛⬛ Redacted ⬛⬛⬛ as noted in the previous sentence.



The Honorable P. Kevin Castel
November 30, 2017
Page 5

Act purposes if it is "likely to influence purchasing decisions." *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH*, 843 F.3d 48, 73 n.11 (2d Cir. 2016) (quoting *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51 (2d Cir. 2016)). TrueCar's market research firm concluded that ███████████████████ Redacted ███████████████████ ███████████████. Plaintiffs' survey expert, Mr. Philip Johnson, explained the relevance of this market research and its applicability to Plaintiffs' own survey findings, which confirmed that consumers viewing TrueCar's ads take away the false message that TrueCar delivers a negotiation-free purchasing experience. TrueCar's "materiality" argument is disingenuous and meritless.

## II.     PLAINTIFFS' DAMAGES EXPERT IS NOT VULNERABLE UNDER *DAUBERT*

Plaintiffs submitted the expert report of Patrick Anderson of Anderson Economic Group, a well-known and established expert in the automotive industry. The Anderson report described three forms of monetary relief sought by Plaintiffs: (1) lost profits by Plaintiffs in light of TrueCar's unlawful diversion of consumer auto purchases; (2) prospective corrective advertising damages; and (3) disgorgement of TrueCar's profits resulting from its unlawful advertising campaign.

### A.     Plaintiffs' Lost Profits

At the damages stage, the plaintiff must prove (1) actual damages and (2) a causal link between those damages and the false advertising. *Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005, 1022 (S.D.N.Y. 1994). However, the law in this Circuit is clear: "courts may engage in 'some degree of speculation in computing the *amount* of damages, particularly when the inability to compute them is attributable to the defendant's wrongdoing.'" *PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 272 (2d Cir. 1987) (emphasis in original); *see also Alpo Petfoods Inc. v. Ralston Purina Co.*, 913 F.2d 958, 969 (D.C. Cir. 1990) ("When assessing these actual damages, the district court may take into account the difficulty of proving an exact amount of damages from false advertising, as well as the maxim that 'the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.'").

Due to the unique structure of the U.S. automobile sales industry, car dealers suffer a direct economic injury each time a consumer residing within the dealer's designated market area purchases a same-make automobile from an out-of-market dealer. This is because each franchised dealer is held to sales quotas within its market territory. These quotas result in incentive rewards for sales in excess of its quota and penalties for failure to achieve its quotas. As a result, every sale counts. Not surprisingly, car dealers compete with each other in attempts to woo consumers to their dealerships. Consumer "leads" are paramount. Plaintiffs filed this lawsuit because TrueCar obtained its leads through unlawful means, namely, by: (1) falsely advertising that consumers could achieve a "no haggle" or "no negotiation" transaction by using TrueCar's services; and (2) falsely advertising that TrueCar customers can buy a car below "factory invoice."



The Honorable P. Kevin Castel
November 30, 2017
Page 6

Expert testimony is necessary in light of the TrueCar business model.  Despite its <span style="background-color:black; color:white">Redacted</span> consumer advertising budget, TrueCar operates under the radar.  TrueCar is a lead-generator that obtains consumer contact information via its website, which it then makes available to its shifting group of "Certified Dealers."  When one of its Certified Dealers makes a sale via a TrueCar lead, TrueCar receives a $299 fee.  Neither the fee nor the nature of the sale is publicly-available information, so Plaintiffs have no way of knowing which of its competitors' sales were "TrueCar" sales.  Some sales were, and some sales were not, because TrueCar's Certified Dealers are not *exclusively* TrueCar dealers—they sell cars through their own independent sales efforts and through other lead-generating vendors.

To answer this question, Plaintiffs' damages experts painstakingly reviewed more than 2.1 million confidential sales records produced by TrueCar under the Protective Order.  These sales records show: (i) Redacted; (ii) Redacted; and (iii) Redacted.  They then undertook a four-step process to calculate Plaintiffs' lost profits damages.



Step one was to calculate the number of same-make TrueCar-commissioned sales made to consumers residing in the Plaintiffs' market areas.  This was done through an arduous process of matching TrueCar's 2.1 million consumer sales records against the zip codes included within each Plaintiff's geographic territory.  This totaled **48,184** units.

Step two was to calculate the ratio of same-make TrueCar-commissioned sales in those market areas to the stream of net profits related to a typical new car sale in the local area.  This ratio involved consideration of multiple factors, including service department revenues, the effects of competing same-make dealers and competing-make dealers, and potential transactions inside and outside the market area.  The stream of profits ratio worked out to be **1:1**.  To be clear, Mr. Anderson did not "assume" that every TrueCar sale in the Plaintiffs' market areas would have gone to Plaintiffs.  No dealer achieves 100% sales.  Instead, he calculated a stream of profits ratio, which worked out to be 1:1.  Although 1:1 is mathematically equivalent to 100%, this does not mean that Mr. Anderson merely assumed that 100% of the TrueCar sales would have been Plaintiffs' sales.  The point was made *ad nauseam* during Mr. Anderson's deposition.  While TrueCar is free to take issue with the ratio, it is disingenuous to argue that it does not exist.

Step three was to determine the average profits per new car sale in the U.S.  This was **$1,602** per car based on independent third-party research from the National Automobile Dealers Association.



The Honorable P. Kevin Castel
November 30, 2017
Page 7


Step four was to calculate lost profits based on the data and calculations generated by steps one, two, and three.  After doing so, Plaintiffs' experts concluded that TrueCar's nationwide advertising campaign resulted in lost profits of **$77.2 million**.[5]

Not surprisingly, TrueCar's rebuttal expert, Dr. Ugone, strongly disagreed with the Anderson Economic Group's conclusions.  Dr. Ugone issued a rebuttal report and sat for a deposition where he described the purported flaws.  However, his myriad of criticisms missed the mark in many respects.  For example, he criticized Anderson's purported failure to apportion damages attributable to four additional advertising claims made by TrueCar.  However, those four claims were dismissed from the lawsuit long ago, and there is no evidence showing that those claims were material to consumers or damaged the Plaintiffs.  In addition, he relied on faulty information regarding the duration and scope of TrueCar's use of the accused advertising claims.  He also failed to recognize that TrueCar's own data allowed Anderson to ▮Redacted▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Most significantly, he disregarded Mr. Anderson's stream of profits ratio and instead argued that Anderson wrongfully assumed in step two (described above) that 100% of the TrueCar sales would have gone to Plaintiffs.  Dr. Ugone's death-by-a-thousand-cuts attack failed to render Anderson's testimony inadmissible under *Daubert*.

There is no dispute that Plaintiffs' damages experts are qualified to opine on the topics in their report.  They have significant experience in both automotive business consulting and auto industry litigation.  They relied on data obtained from TrueCar's own records as well as independent industry sources.  They based their opinions on that data and on their specialized knowledge obtained through decades of industry experience.  As a result, Anderson Economic Group's testimony will undoubtedly assist the trier of fact.  *See Velez v. Sony Discos*, 2007 U.S. Dist. LEXIS 5495, at *16 (S.D.N.Y. Jan. 16, 2007) (Castel, J.).  TrueCar's arguments more properly go to the weight of the Anderson testimony, not its admissibility.  *See, e.g., Bah v. City of N.Y.*, 2017 U.S. Dist. LEXIS 13285, at **26-27 (S.D.N.Y. Jan. 31, 2017) (Castel, J.)  Plaintiffs anticipate a battle of the experts at trial.

### B.      Prospective Corrective Advertising Damages

Anderson's report also includes a damages analysis based on corrective advertising.  Courts in Lanham Act cases have awarded prospective corrective advertising damages under the FTC-based 25% model set forth in *Big O Tire Dealers, Inc. v. The Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1375 (10th Cir. 1977).  Although not a common remedy, it is particularly appropriate

---

[5] Anderson Economic Group experts then used alternative methodologies described in the expert report as "reasonableness checks" on their conclusions reached via the primary methodology described above.  The reasonableness checks corroborated their conclusions.



The Honorable P. Kevin Castel
November 30, 2017
Page 8

where a plaintiff lacks the economic resources to conduct its own corrective campaign. *Id.* Such is the case at hand where Plaintiffs are primarily small businesses operating in separate geographic territories, but are competing against TrueCar's national advertising campaign and its nationwide network of TrueCar Certified Dealers. Applying the 25% rule, Mr. Anderson calculated **$129 million** in prospective corrective advertising damages. This, too, withstands TrueCar's *Daubert* challenge.

### C.        Profits Disgorgement

In addition to lost profits and corrective advertising damages, Plaintiffs seek a profits disgorgement based on TrueCar's willfully and deliberately false advertising claims. *See Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 262 (2d Cir. 2014) (affirming disgorgement award). Under the Lanham Act, Plaintiffs' burden is only to show TrueCar's gross sales. TrueCar bears the burden of proving any costs or deductions. 15 U.S.C. § 1117. Mr. Anderson applied a conservative model. Although TrueCar's accused ad campaigns were nationwide in scope, he relied solely upon revenues in Plaintiffs' markets, and not nationwide revenues. Although it is TrueCar's statutory burden to prove deductible costs, based upon TrueCar's publicly disclosed profit margins, Mr. Anderson estimated TrueCar's illicit profits from this revenue to be **$13 million**.

In contrast, Dr. Ugone claims **$0** in disgorgeable profits based on TrueCar's failure to turn a profit on a company-wide basis. However, the law is clear: "It is irrelevant that [defendant] *as a whole* failed to turn a profit during the period of the advertising. The amount to be awarded is the financial benefit [defendant] received because of the advertising." *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1042 (9th Cir. 1986) (emphasis in original). Any doubt as to TrueCar's intent was swept away by the production of its previously-withheld internal legal communications. *See Merck*, 760 F.3d at 261.

### III.        CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully urge this Court to deny TrueCar's request for leave to file a motion for summary judgment or its *Daubert*-based motion to strike Plaintiffs' damages expert. Should the Court allow TrueCar to file its motions, Plaintiffs have no objection to the briefing schedule as set forth in its pre-motion letter.

Sincerely,

Robert E. Chudakoff
Lead Counsel for Plaintiffs
cc:        All Counsel of Record (unredacted, by email)