UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

DEPENDABLE SALES & SERVICE, INC., *et al.*, :
                                     :
                    Plaintiffs, :
                                       :    15 Civ. 1742 (PKC)
                    -against- :
                                         :

TRUECAR, INC., :
                                       :
                  Defendant. :

———————————————————— x

**TRUECAR'S MEMORANDUM OF LAW IN SUPPORT OF ITS
<u>MOTION TO EXCLUDE THE EXPERT REPORT OF PATRICK ANDERSON</u>**

## TABLE OF CONTENTS

Preliminary Statement ................................................................................................ 1

Statement of Facts ..................................................................................................... 2

    A.    Background .................................................................................... 2

    B.    Mr. Anderson's Opinions and Methodology ............................... 4

        1.    Plaintiffs' Alleged Lost Profits ......................................... 4

        2.    TrueCar's Alleged Profits for Disgorgement ............................. 11

        3.    Proposed Corrective Advertising "Fine" ...................................... 12

Argument ................................................................................................................ 12

Point 1    MR. ANDERSON'S CALCULATION OF LOST PROFITS
RESTS ON SPECULATIVE ASSUMPTIONS, IGNORES
RELEVANT FACTORS AFFECTING INDIVIDUAL DEALER
SALES, AND IS CONTRARY TO THE FACTS OF THE CASE ....................14

    A.    Mr. Anderson Improperly Assumes Every Challenged Sale Was
Caused by the Challenged Claims and That Plaintiffs Would Have
Made 100% of the Challenged Sales ........................................ 15

    B.    Mr. Anderson Fails to Consider Obvious Alternative Explanations
for Sales Made by TrueCar-Affiliated Dealers and Lost by
Plaintiff-Dealers ...................................................................... 19

    C.    Mr. Anderson's Use of An Average Profit Per-Hood Figure Does
Not Fit the Facts of this Case Because it Does Not Take Into
Account Plaintiffs' Individual Competitive Environments ..................... 20

    D.    Mr. Anderson's Other Errors are Further Indicia of Unreliability ........... 21

Point 2    MR. ANDERSON'S DISGORGEMENT CALCULATION IS
BOTTOMED ON THE SAME SPECULATIVE ASSUMPTIONS
AS HIS LOST PROFITS MEASURE ................................................ 21

Point 3    MR. ANDERSON'S "ARBITRARY 25% FINE"
CALCULATION DOES NOT FIT THE FACTS OF THIS CASE ..................... 22

Conclusion .............................................................................................................. 24

<u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Home Prods. Corp. v. Johnson & Johnson*,
   682 F. Supp. 769 (S.D.N.Y. 1988)................................................................................15, 23

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)........................................................................................13, 18

*Apotex, Inc. v. Acorda Therapeudics, Inc.*,
   823 F.3d 51 (2d Cir. 2016)................................................................................................14

*Astra Aktiebolag v. Andrx Pharms., Inc.*,
   222 F. Supp. 2d 423 (S.D.N.Y. 2002)...............................................................................14

*Boucher v. U.S. Suzuki Motor Corp.*,
   73 F.3d 18 (2d Cir. 1996) ............................................................................................ 17-18

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
   627 F. Supp. 2d 384 (D.N.J. 2009) ...................................................................................16

*Burndy Corp. v. Teledyne Indus., Inc.*,
   748 F.2d 767 (2d Cir. 1984)........................................................................................14, 15

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
   650 F. Supp. 2d 314 (S.D.N.Y. 2009)..........................................................................17, 18

*Concordia Pharm., Inc. v. Method Pharm., LLC*,
   2016 WL 1464639 (W.D. Va. Apr. 13, 2016) ..................................................................19

*Daubert v. Merrill Dow Pharmaceuticals*,
   509 U.S. 579 (1993)................................................................................................. *passim*

*Faulkner v. Nat'l Geographic Soc'y*,
   576 F. Supp. 2d 609 (S.D.N.Y. 2008).................................................................................18

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997).............................................................................................................13

*In re Gen. Motors LLC Ignition Switch Litig.*,
   2017 WL 6729295 (S.D.N.Y. Dec. 28, 2017) ...................................................................17

*Infinity Headwear & Apparel, LLC v. Jay Franco & Sons, Inc.*,
   2017 WL 3309724 (S.D.N.Y. Aug. 2, 2017)......................................................................21

*Israel v. Springs Indus. Inc.*,
  2006 WL 3196956 (E.D.N.Y Nov. 3, 2006)....................................................19, 20

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
  2006 WL 1359955 (S.D.N.Y. May 18, 2006) .........................................................22

*In re Kraft*,
  114 F.T.C. 40 (1991).............................................................................................23

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)..............................................................................................13

*Lava Trading, Inc. v. Hartford Fire Ins. Co.*,
  2005 WL 4684238 (S.D.N.Y. Apr. 11, 2005)..............................16,  17 & n.9, 18

*LinkCo, Inc. v. Fujitsu Ltd.*,
  2002 WL 1585551 (S.D.N.Y. July 16, 2002) ........................................................17

*In re M/V MSC Flamina*,
  2017 WL 3208598 (S.D.N.Y. July 28, 2017) ..................................................17, 18

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007).................................................................21

*Microstrategy Inc. v. Bus. Objects, S.A.*,
  429 F.3d 1344 (Fed. Cir. 2005)............................................................................18

*Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*,
  880 F. Supp. 1005 (S.D.N.Y. 1993).....................................................................14

*MTX Commc'ns Corp. v. LDDS/Worldcom, Inc.*,
  132 F. Supp. 2d 289 (S.D.N.Y. 2001)..................................................................19

*Nikkal Indus. v. Salton, Inc.*,
  735 F. Supp. 1227 (S.D.N.Y. 1990)......................................................................19

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005).................................................................................13

*Okraynets v. Metropo. Transp. Auth.*,
  555 F. Supp. 2d 420 (S.D.N.Y. May 21, 2008) ...................................................20

*Otis v. Doctor's Assocs., Inc.*,
  1998 WL 673595 (N.D. Ill. Sept. 14, 1998) ........................................................20

*PBM Prods., LLC v. Mead Johnson & Co.*,
  639 F.3d 111 (4th Cir. 2011) ...............................................................................16

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
  2003 WL 21242769 (S.D.N.Y. May 28, 2003) ....................................................23

*Reed Const. Data Inc. v. McGraw-Hill Cos.*,
  49 F. Supp. 3d 385 (S.D.N.Y. 2014).............................................................20 n.10

*Salon Fad v. L'Oreal USA, Inc.*,
  2011 WL 4089902 (S.D.N.Y. Sept. 14, 2011).............................................19, 21

*Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc.*,
  902 F.2d 222 (3d Cir. 1990)............................................................................23

*United States v. Williams*,
  506 F.3d 151 (2d Cir. 2007)............................................................................13

*Verisign, Inc. v. XYZ.com LLC*,
  848 F.3d 292 (4th Cir. 2017) ...........................................................................16

*Zenith Elecs. Corp. v. WH-TV Broadcasting Corp.*,
  395 F.3d 416 (7th Cir. 2005) ....................................................................17 & n.9

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*,
  571 F.3d 206 (2d Cir. 2009)............................................................................13

**Statutes**

Lanham Act Section 43(a)(1)(B), 15 U.S.C. § 1125(a) ....................................... *passim*

**Other Authorities**

Fed. R. Evid. 702 ................................................................................................... *passim*

Defendant TrueCar, Inc. ("TrueCar") respectfully submits this memorandum in support of its motion to exclude the report of Plaintiffs' economic expert, Patrick Anderson (the "Anderson Report") under Fed. R. Evid. 702 and *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1993).

<u>Preliminary Statement</u>

It is black letter law that a Lanham Act plaintiff may only recover damages caused by the false advertising at issue.  In support of their liability and damages claims, the 108 plaintiff-car dealers who brought this Lanham Act false advertising suit against TrueCar offer the report of their damages expert, Patrick Anderson.  In light of the governing standard, Mr. Anderson must demonstrate to the Court that his proposed method can reliably quantify the injury caused by the two challenged advertising claims that remain in this case.  In that connection, the Anderson Report proposes three damages measures:  a lost profits measure of damages, a disgorgement measure, and a self-described "arbitrary 25% fine." Not one of these metrics is admissible.

Mr. Anderson's lost profits measure rests on two demonstrably unfounded assumptions:  (i) that each and every one of Plaintiffs' alleged lost sales was caused by the challenged advertising claims, and (ii) that each sale made by a TrueCar-affiliated dealer was one that would have gone to the Plaintiffs, and not to one of their competitors, whether or not affiliated with TrueCar.  Completely ignoring the record evidence, Mr. Anderson makes no attempt to engage obvious alternative causes or to provide a reasonable explanation for his conclusions.  Moreover, although nearly all of the Plaintiff-dealers provided financial statements in support of the individualized damages they seek, Mr. Anderson arbitrarily assigns each dealer a national average figure that bears little resemblance to many of the Plaintiffs' actual per-hood profits.

Mr. Anderson's disgorgement analysis is bottomed on the same faulty assumptions as his lost profits calculation and attempts to manufacture profits to disgorge from TrueCar's operating losses with economically unjustifiable inputs. And his arbitrary 25% fine approach, borrowed from Federal Trade Commission ("FTC") precedent, if applicable to private litigants under the Lanham Act at all, is wholly inapplicable here, where Plaintiffs and TrueCar are not in direct competition.

Given the myriad baseless and unsupported assumptions on which the Anderson Report is based, Mr. Anderson's testimony is unreliable as a matter of law, and should be excluded under *Daubert*.

<u>Statement of Facts</u>

A. <u>Background</u>

This is a false advertising case brought under Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a), and parallel state statutes.

TrueCar is a publicly held company that collects and analyzes anonymized, historical data regarding new-car purchases that have occurred in a user's geographic area, and also provides an online communications platform that allows potential customers to connect with local dealers affiliated with TrueCar. TrueCar does not sell cars, nor own brick-and-mortar dealerships, and thus does not directly compete with the Plaintiff-dealers.

Consumers interact with TrueCar through its website (the "Website") and mobile application (the "App"), where they select a vehicle, add desired options, and input a ZIP code to see local market pricing data on recent new car sales in their area. TrueCar, Inc., Annual Report (Form 10-K), at 4 (Mar. 1, 2017), attached to the Declaration of Harold P. Weinberger Esq. dated January 19, 2018 ("Weinberger Decl.") as Exhibit A. In most instances, consumers are then presented with the "TrueCar Curve," a "graphical distribution of what others paid for a similar

make, model and trim of car." *Id.* The curve displays the manufacturer's suggested retail price ("MSRP"), factory invoice, and average price paid for that make, model and trim in the consumer's local market. *Id.* Generally, the curve also displays a proprietary calculation based on the recent transactions of TrueCar users, which provides an understanding of what others have paid for similarly configured vehicles, enabling consumers to "evaluate a potential price in the context of broader market data." *Id.*

After viewing this market pricing information, consumers may connect with local TrueCar-affiliated car dealers through the Website or App by authorizing release of their contact information to those dealers. *Id.* Upon doing so, consumers receive from the dealers one or more Guaranteed Savings Certificates, which reflect a guaranteed savings off Manufacturer's Suggested Retail Price ("MSRP") that the consumer may take to the issuing dealer and apply toward the purchase of the specified make, model and trim of car. *Id.* In most instances, consumers also receive price offers on specific in-stock vehicles, identified by their unique Vehicle Identification Numbers (commonly called "VINs"), from these dealers. *Id.* at 5.

Plaintiffs are 108 automobile dealers that are not currently affiliated with TrueCar.[1] In their operative First Amended Complaint ("FAC") (ECF No. 23), Plaintiffs alleged that six TrueCar advertising claims diverted sales from Plaintiffs to TrueCar-affiliated dealers and caused Plaintiffs reputational damage. (FAC ¶ 293). On January 6, 2016, the Court granted in part TrueCar's motion to dismiss the FAC, rejecting four of the six advertising claims as a basis for Lanham Act liability (the "Dismissed Claims"). ECF No. 36. Two claims (together, the "Challenged Claims") remain in the case:

---

[1]     The First Amended Complaint names 162 Plaintiffs. ECF No. 23. Of these, 31 were dropped from the litigation pursuant to stipulation on September 6, 2016 (ECF No. 43), and an additional 23 were dropped by stipulation on October 23, 2017. ECF No. 71.

- "The No Haggle Claim":  Plaintiffs allege that TrueCar falsely advertises "that its customers can utilize TrueCar's services to purchase an automobile without haggling."  (FAC ¶ 186).  Plaintiffs also dispute that TrueCar-affiliated dealers "guarantee savings without negotiation" and challenge the statements that TrueCar's business model involves "[n]o [s]urprises," and a "stress-free" and "haggle-free" experience (*id.* ¶¶ 186, 188); and

- "The Factory Invoice Claim":  Plaintiffs allege that the advertising relating to a "factory invoice" price for new automobiles and a graphic on TrueCar's website showing a "TrueCar Price" that is lower than the "factory invoice" price imply that the dealer paid the "factory invoice" price to purchase the vehicle from the manufacturer and mislead consumers into thinking that TrueCar allows them to pay "less than the dealer paid."  *Id.* ¶¶ 228-29.

B.    Mr. Anderson's Opinions and Methodology

In support of their damage claims in this action, Plaintiffs offer the report of their economic expert, Patrick Anderson ("Anderson Rpt.").[2]  The Anderson Report presents three claimed damages calculations:   (i) Plaintiffs' supposed lost profits; (ii) disgorgement of TrueCar's profits; and, on the "recommend[ation]" of Plaintiffs' counsel, (iii) an "arbitrary" fine of 25% modeled on an FTC damages measure.  Anderson Rpt. at 34.  Of the three, Mr. Anderson considers the lost profits calculation to "provide a more accurate estimate of the amount necessary to make the injured parties whole."  *Id.*

1.    Plaintiffs' Alleged Lost Profits

To calculate lost profits, the Anderson Report attempts to quantify Plaintiffs' lost sales.  The starting point for the calculation is based on the Plaintiff-dealers' proximity to any ZIP code searched by a TrueCar customer before ultimately buying a new car from a TrueCar-affiliated dealer, wherever located.   So long as a consumer searched for a car on

---

[2]    The Anderson Rpt. contains material designated as Highly Confidential under the operative Protective Order in this case (ECF No. 42), and is the subject of TrueCar's contemporaneously filed motion to seal.  The Anderson Rpt. has been provided to the Court as Exhibit C to the declaration of Norman C. Simon, dated January 19, 2018 (the "Simon Decl."), which accompanies the sealing motion.

www.truecar.com in a ZIP code within a 30-minute drive of a Plaintiff-dealer, the Anderson Rpt. treats a sale of a same-make car to that consumer by any TrueCar dealer in the United States as a sale caused by the advertising at issue and as a sale lost to that Plaintiff.[3]  Mr. Anderson sums the number of claimed lost sales across Plaintiff-dealers and across the period January 2009 through June 2016 for a total of 48,184 alleged lost sales (the "Challenged Sales").  Anderson Rpt. at 33 & Exh. H.

Rather than conduct "any analysis as to whether the four claims that the Court dismissed were causing any injury to the plaintiffs," as Mr. Anderson admits in his deposition, the transcript of which, in relevant part, is annexed to the Weinberger Decl. as Exhibit B ("Anderson Tr."), he relied on nothing more than his "professional judgment" and supposed "knowledge of the industry" when he concluded that the No Haggle Claim caused all 48,184 of Plaintiffs' alleged lost sales.  Anderson Tr. 21:2-7.  On the basis of this same "professional judgment," Mr. Anderson concluded that it "wasn't necessary" for him to analyze the causal effect, if any, of the four Dismissed Claims because "they weren't causing damage to the plaintiff[s]."  *Id.* 19:20-21:21.  Further, Mr. Anderson concedes he cannot "disentangle" the Factory Invoice Claim from the No Haggle Claim and that he "didn't try" to do so.  *Id.* 34:11-16; 42:16-24.  Yet he opines, for reasons that are anything but clear, that "factory invoice is a very small part of the causation of damages" (*id.* 41:17-18) — so insignificant, purportedly, that "if the words factory invoice were not part of the [case], it wouldn't affect [his] damages estimate" at all.  *Id.* 47:9-12.

---

[3]     In a minority of instances, Mr. Anderson considered the sale lost to every Plaintiff-dealer whose manufacturer-designated market area included the searched ZIP code.  Anderson Rpt. Exh. E-3 ¶ 7.

Mr. Anderson's assumption that any sale of a same-make car by a TrueCar dealer in a ZIP code within a 30-minute drive of a Plaintiff-dealer is a lost sale caused by the advertising at issue also disregards the possibility — indeed, the likelihood — that numerous features of TrueCar's business unrelated to the Challenged Claims contribute to its sales.  As explained in the report of TrueCar's expert, Dr. Keith Ugone ("Ugone Rpt."), "Mr. Anderson implicitly has assumed that *no* other features of TrueCar influenced a new car buyer's purchase decision.[4]   However, TrueCar offers customers and dealers numerous other attributes and features that contribute to new car sales."   Ugone Rpt. at 28, ¶ 38.   Even though he acknowledged that the Website contained other features besides the Challenged Claims and that some consumers purchased cars from TrueCar affiliated dealers because of those features (Anderson Tr. 80:9-81:21), when asked if he had made "any attempt to determine how other services provided by the TrueCar website contribute to TrueCar car related new car sales apart from the advertising claims," Mr. Anderson admitted that he "didn't attempt to separately estimate that." *Id.* at 97:19-25.[5]  Similarly, Mr. Anderson cited a 2014 TrueCar Messaging Study conducted by Palma Companies (the "Palma Study") for its conclusion that a version of the No Haggle Claim resonated with consumers, but he made no attempt to quantify the impact of the

---

[4]     Like the Anderson Rpt., the Ugone Rpt. contains material designated as Highly Confidential under the Protective Order and is also the subject of TrueCar's contemporaneously filed motion to seal.  The Ugone Rpt. has been provided to the Court as Exhibit E to the Simon Decl.

[5]     While Mr. Anderson relies heavily on TrueCar's 2016 10-K filing to support his conclusion that "the promise that matters to consumers is the guaranteed savings and the no negotiation, not some . . . concept like transparency"  (Anderson Tr. 124:14-17), in that very filing TrueCar states:  "The key tenets of our brand are providing *transparent market price information* and enhancing the car-buying experience for both consumers and dealers."  TrueCar, Inc., Annual Report (Form 10-K), at 6 (Mar. 1, 2017) (emphasis added).  Properly evaluated, "TrueCar's annual SEC filings indicate that TrueCar's value to consumers and dealers is attributable to numerous features of TrueCar unrelated to the Challenge Claims."  Ugone Rpt. at 30, ¶ 40(c).

other messages tested by the Palma Study, several of which received nearly the same degree of interest as the "no negotiation" claim. *Id.* 102:6-10. As Dr. Ugone explains, the Palma Study demonstrates that many messages unrelated to the Challenged Claims influenced consumers' decision to use TrueCar when purchasing a new car, and "[t]his evidence is inconsistent with Mr. Anderson's assumption that all TrueCar related new car sales are attributable to the Challenged Claims." Ugone Rpt. at 29-30, ¶ 40(a).[6]

Mr. Anderson's assumption regarding causation also ignores abundant additional record evidence that factors other than the Challenged Claims cause consumers to buy a car from a particular dealership. Nearly every Plaintiff admitted at deposition that there are numerous such causal factors, including pricing, inventory, location, reputation, recommendations of friends or family and on-line reviews. Just by way of example:

- Michael Gruber of Paul Miller BMW admitted that there are many reasons why customers would buy outside of their local market, including "[p]rice, perceived price, service, perceived service, . . . [and] referral." (Tr. 95-96)

- Frank Bellavia, of Arnold Chevrolet and Bellavia Buick admitted it is possible that both dealerships lost sales for reasons having nothing to do with the alleged false advertising, including an overall decrease in demand, a decrease in demand for specific makes and models of cars that he sells, bad reviews, and increased competition within his geographic area. (Tr. 94-95)

---

[6]    Moreover, although Mr. Anderson acknowledged that data exists allowing him to compare the sales of TrueCar-affiliated dealers before, during, and after TrueCar ran the No Haggle Claim, he conducted no such analysis. Anderson Tr. 293:15-295:16. Dr. Ugone, *did* undertake such an analysis, and as indicated in his report, it shows "no discernible, systematic, and/or persistent change in . . . TrueCar-related car sales of the magnitude posited by Mr. Anderson when the No Haggle Claim was introduced or removed," particularly "once seasonality is accounted for in the data." Ugone Rpt. at 44-47, ¶¶ 59-62 & Figure 4; *id.*, Exh. 6. Indeed, Dr. Ugone found that "the changes in monthly sales *during* the period when the No Haggle Claim was in use are uncorrelated with the observed changes at the implementation and the removal of the claim." *Id.* ¶ 61.

- Joel Sporn, of Westbury Jeep Chrysler Dodge admitted that "there were hundreds of factors that affect whether [he] get[s] more customers or not at that point in time" (Tr. 64) and "several reasons why customers may choose to buy a car from one dealership instead of another" (Tr. 64-67).

A chart excerpting the testimony of most of the Plaintiffs on this point and relevant pages of the testimony quoted here by witness is appended to the Weinberger Decl. as Exhibit C.

Mr. Anderson also was unaware that many of the Plaintiff-dealers subscribe to Edmunds.com, which makes no haggle, guaranteed savings, and invoice representations that are nearly indistinguishable from those challenged here. *See* Weinberger Decl. Exhs. D, E & F. In fact, Mr. Anderson testified that he "ha[d] never seen the advertising for" Edmunds.com. Anderson Tr. 120:24-25. But as Dr. Ugone explains:

> Given Mr. Anderson's assumption that all of the TrueCar-related new car sales were attributable to the Challenged Claims, it would be inconsistent from a damages perspective for plaintiff dealers to claim lost sales because of the Challenged Claims if they have made similar claims. If a plaintiff dealer made a similar claim, the consumer likely chose the TrueCar dealer over the plaintiff dealer for reasons unrelated to the Challenged Claims. The evidence in this matter indicates the plaintiff dealers utilized similar claims as the Challenged Claims, and hence the Challenged Claims are not determinative as to where new car purchases take place.

Ugone Rpt. at 36, ¶ 48.

Mr. Anderson's lost profits analysis is predicated on another key assumption that is lacking in evidentiary support in that he speculates that, but for the Challenged Claims, each and every one of the Challenged Sales would have gone to a Plaintiff-dealer. Specifically, Mr. Anderson counted "every one" of the 48,184 Challenged Sales as a lost sale to the Plaintiff-dealers. Anderson Tr. 141:16-17. He did so notwithstanding his concessions that TrueCar dealers are not the only competitors of the Plaintiff-dealers for TrueCar-related sales in a particular region, and "in general they have multiple competitors." *Id.* at 141:19-142:8. There is

8

no analysis in the Anderson Report that justifies allocating all of the Challenged Sales to the Plaintiff-dealers in the face of this competition.

Having calculated and allocated the Challenged Sales on the basis of these two improper assumptions, Mr. Anderson then uses what he calls a "1:1 ratio" to determine a dollar damage figure.[7]  Specifically, Mr. Anderson applies his ratio to $1,602 — which is the average net profit before tax of an average light-vehicle dealership per new unit sold, as reported by the National Automobile Dealers Association ("NADA") — and multiplies that figure by the 48,184 Challenged Sales.  This yields a purported total lost-profits calculation for all of the Plaintiffs collectively of $77,177,604.

Although Mr. Anderson was provided with financial statements reflecting each Plaintiff-dealer's actual new vehicle profits for all but two of the 108 Plaintiff-dealers, he completely ignores this data.  Anderson Rpt. at 32-33 & Table 1, 38-39 & Exh. B-9; Ugone Rpt. at 23, Table 2.   He does so despite his concession that he believed the individual Plaintiff-dealer's financial statements to be a "reliable basis" to evaluate individual dealers' profits, and his further admission that if this case involved just one plaintiff, he "would probably use the individual dealer's financial statement as the primary indicator" of damages and would merely "corroborate" it with data from NADA and elsewhere.  Anderson Tr. 230:7-22; 234:5-13.[8]  In

---

[7]     Mr. Anderson claims in his deposition that this ratio somehow rationalizes his allocation of all 48,184 units to the Plaintiffs, but his explanation is incomprehensible and has nothing to do with that issue.  Anderson Tr. 137:7-138:9; 139:21-141:1.

[8]     The only objection Mr. Anderson voiced to using the individual dealers' financial data was that is not "standardiz[ed]" and thus does not provide a basis to compare per hood profits "across multiple different dealers."   Anderson Tr. 230:3-6, 22-23.  But as each Plaintiff-dealer in this case can claim only its own lost profits as damages, there is no reason to compare financial statements across dealerships.  And even if such comparison were required, Mr. Anderson admitted he had already "examin[ed]" a "subset" of the individual dealers' financial statements after "convert[ing] them to a standard form . . . ." *Id.* 229:13-18.

fact, the $1,602 per hood profit figure Mr. Anderson used is demonstrably greater than many of the Plaintiffs' actual per hood profits.  Ugone Rpt. at 74, ¶¶ 100, 101 & Exh. 12.  *See* Anderson Rpt. at 32-33 & Table 1, 38-39 & Exh. B-9; Ugone Rpt. at 23, Table 2.

Dr. Ugone explains that Mr. Anderson's "'one size fits all' approach . . . ignores the competitive and individual dynamics unique to each plaintiff dealer."  Ugone Rpt. at 78, ¶ 105.  Indeed, Mr. Anderson conceded many of the limitations of his approach.  He admitted, for example, that his use of the NADA average profits figure was not a suggestion that "every plaintiff dealer in this case has a net profit of $1,602 per vehicle . . . ."  Anderson Tr. 228:1-6. And while he admitted that individual dealers' profitability could "[c]ertainly" be affected by characteristics such as the location, the brand strength of the cars sold, the degree of competition with other dealers in the area, and the local economic conditions (*id.* 223:21-226:10), Mr. Anderson conceded that he "didn't do a local economic condition analysis for every plaintiff dealer . . . ." *Id.* 226:14-17.

Finally, in addition to the fundamental flaws already described, Mr. Anderson's lost profits analysis contains a number of additional obvious errors, which serve to belie even a pretense of reliability.  Among other things, the Anderson Report:

- Fails to address TrueCar's affinity partners — third parties, including USAA, Consumer Reports, AAA and American Express — that partner with TrueCar and provide TrueCar-equivalent services through their own websites and mobile applications, and the impact those affinity partners have on TrueCar's operations. This is significant because these sales represent 50% - 60% of TrueCar-related new car sales (Ugone Rpt. at 91, n.243) and because car sale leads through affinity partners' sites primarily are attributed to the services and reputation of the affinity partners, and are unrelated to the Challenged Claims. *See* Ugone Rpt. at 39-41, ¶¶ 52-55.

- Calculates damages arising from the No Haggle Claim before its introduction and after TrueCar changed its marketing strategy and discontinued the claim. *See* Ugone Rpt. at 41-58, ¶¶ 56-58.

- Calculates damages for certain Plaintiffs while they themselves were TrueCar dealers, and thus ostensibly benefitted from the Challenged Claims. *See* Ugone Rpt. at 76-77, ¶¶ 102-04.

- Allocates 100% of the same sale to multiple Plaintiff-dealers whenever more than one dealer was located within a 30 minute drive time of a searched ZIP code. This includes 401 instances where either of two Plaintiff-dealers could claim the same Challenged Sale and 31 instances where three same-make plaintiff dealers could do so, resulting in an inflation of calculated lost sales of $8.9 million. *See* Ugone Rpt. at 68-71 ¶¶ 92-95.

- Arbitrarily uses a "30 minute drive time" to set geographic boundaries for his analysis without taking into account admittedly germane factors such as proximity to the dealer, commuting patterns, geographic barriers, other unusual local factors (for example, commonplace heavy traffic in urban areas), and actual buying patterns. *See* Ugone Rpt. at 63-68, ¶¶ 85-91.

- Matches TrueCar dealers and Plaintiff-dealers that are sometimes located at great distances from one another. For example, for one particular Plaintiff-dealer (Fitzgerald Lakeforest Motors), which is located in Maryland, Mr. Anderson ascribed lost sales to TrueCar dealers located as far away as North Dakota, Colorado and Texas. *See* Ugone Rpt. at 53-54, ¶ 72 & Figure 5.

2.   TrueCar's Alleged Profits for Disgorgement

As Mr. Anderson himself confirmed, after accounting for its operating expenses, TrueCar's profits associated with TrueCar-related new car vehicles were negative for Mr. Anderson's entire damages period. Anderson Tr. 285:11-20. There are therefore no profits to disgorge. Given this reality, Mr. Anderson attempted to cite only the revenue generated by the 48,184 Challenged Sales derived from his lost-profits analysis and apply TrueCar's gross profit

margin to the revenue of $299 per hood earned by TrueCar to reach a figure of $13 million. Anderson Rpt. at 34 and Ex. F-4.  Thus, his disgorgement analysis is plagued by the very same flaws as his lost profits analysis, and if the lost profits opinion is rejected this would fall as well. Indeed, Mr. Anderson conceded as much in his deposition.  Anderson Tr. 278:19-279:13.

### 3.   Proposed Corrective Advertising "Fine"

Mr. Anderson's calculation of corrective advertising relies upon "an arbitrary 25% fine percentage" of a firm's total advertising expenditure that is "used by the FTC in cases where enough data are not available to use a precise measure."  Anderson Rpt. at 34 & Exhibit F-4.  Unlike his disgorgement calculation, which looks only to the costs associated with the 48,184 Challenged Sales, Mr. Anderson's corrective advertising "fine" estimates 25% of TrueCar's total advertising expenditures for new car sales over the damages period for a total of $129 million.  Anderson Rpt. at 34 & Exh. F-4; Ugone Rpt. at 24, ¶ 33 & Table 4; Ugone Rpt. at 91 n.244.  Mr. Anderson acknowledged that he was not rendering the opinion that this was an appropriate percentage to use or remedy to award.  Anderson Tr. 289:20-290:14.

### Argument

Rule 702 governs the admissibility of scientific, technical, or other expert testimony.  The rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals*, the Supreme Court held that Rule 702 imposes a "gatekeeping" responsibility on the federal trial courts to "ensure that any and all

scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. 579, 589 (1993). *Daubert*'s principles and requirements "appl[y] to all expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). As the proponents of the Anderson Report, Plaintiffs bear the "burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citing *Daubert*).

To be reliable, an expert's testimony must be grounded in the methods and procedures of scientific, technical, or other specialized knowledge, and it must be based on more than subjective belief or speculation. *Daubert*, 509 U.S. at 589-90; *see also Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213-14 (2d Cir. 2009) ("[A] trial judge should exclude expert testimony if it is speculative or conjectural . . . ."). Moreover, "it is critical that an expert's analysis be reliable at every step . . . . *[A]ny* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (citations and internal quotation marks omitted).

Moreover, to be relevant, the expert's testimony must "fit" the issues in the case by having a "valid scientific [or other technical] connection to the pertinent inquiry." *Daubert*, 509 U.S. at 591-92; *see Kumho Tire*, 526 U.S. at 141. Courts must consider the degree to which the data actually support the expert's conclusion. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

"If the expert has failed to consider the necessary factors or if the analysis is premised upon a faulty assumption, his testimony may be excluded for lack of probative value." *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 488 (S.D.N.Y. 2002).

As demonstrated below, Mr. Anderson's opinions are inadmissible under *Daubert* because they are neither reliable nor appropriately tied to the facts of this case.

Point 1

MR. ANDERSON'S CALCULATION OF LOST PROFITS RESTS ON
SPECULATIVE ASSUMPTIONS, IGNORES RELEVANT FACTORS AFFECTING
INDIVIDUAL DEALER SALES, AND IS CONTRARY TO THE FACTS OF THE CASE

A lost profits damages award is not automatic merely based on a finding of liability.  Rather, a plaintiff seeking to recover damages under the Lanham Act must first show (1) that there is a causal link between the alleged false advertising and plaintiff's damages and (2) that the methodology used to calculate damages caused by the alleged false advertising is reliable.  *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 771 (2d Cir. 1984) ("a plaintiff who establishes false advertising in violation of § 43(a) of the Lanham Act will be entitled only to such damages as were caused by the violation").  It is not enough for a plaintiff seeking Lanham Act lost profits damages to point to the defendant's general "advertisement efforts"; it must show injury caused by "*the specific misrepresentation*" alleged to be false.  *Apotex, Inc. v. Acorda Therapeudics, Inc.*, 823 F.3d 51, 68 (2d Cir. 2016) (emphasis added); *see also Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005, 1022 (S.D.N.Y. 1993) (Lanham Act "plaintiff must show that he or she suffered actual damages that were causally related to 'actual consumer confusion or deception' of the purchasing public.").

A.    Mr. Anderson Improperly Assumes Every Challenged Sale
Was Caused by the Challenged Claims and That Plaintiffs
Would Have Made 100% of the Challenged Sales

*Burndy* provides the framework for evaluating the requisite evidence of a causal

link between alleged false advertising and plaintiff's damages that is required for a lost profits

analysis under the Lanham Act.   There, the Second Circuit found evidence that false advertising

caused the plaintiff to lose profits to be "deficient" for multiple reasons, including: (1) "'no

evidence that even a reasonably identifiable percentage of defendant's allegedly ill-gotten sales

would have gone to the plaintiff' in view of the existence of other competitors and competing

products in the market"; (2) no evidence that buyers informed of the false advertising would

have purchased instead from plaintiff; and (3) a failure to take into account that some customers

might purchase defendant's falsely-advertised product "for uses not involving" the claim at

issue.   748 F.2d at 770 (citation omitted).   The Anderson Report suffers from all of these

deficiencies.    Among  its  many  flaws,  it  is  premised  on  the  impermissibly  speculative

assumptions — contrary to the record evidence — that each and every one of the Challenged

Sales was caused by the Challenged Claims, and that every one of the Challenged Sales should

be allocated to the Plaintiff-dealers as a lost sale.

The Anderson Report simply does not measure the damages allegedly caused by

the Challenged Claims as opposed to myriad other factors, including TrueCar's business model

itself.  (*See supra* at 4-12).   Courts have routinely excluded expert opinions in Lanham Act cases

precisely because they improperly assumed, like Mr. Anderson, that all of the plaintiff's lost

sales were caused by defendant's advertising. *See American Home Prods. Corp. v. Johnson &*

*Johnson*, 682 F. Supp. 769, 771 (S.D.N.Y. 1988) (rejecting "the assumption that the entire

difference between the number of anticipated physician recommendations and the number of

actual physician recommendations is attributable to false or misleading advertising" finding that

such a conclusion was "highly questionable" because it "ignores the multitude of other factors which might have influenced physicians"); *Lava Trading, Inc. v. Hartford Fire Ins. Co.*, , 2005 WL 4684238, at *2, *3, *12 (S.D.N.Y. Apr. 11, 2005) (Castel, J.) (affirming magistrate's recommendation that expert testimony did not meet *Daubert* standard because plaintiff's damages projections were "wishful thinking," client-driven assumptions that did not deserve the "mantle" of expert opinion, and lost profits analysis demanded "a far greater degree of precision in analysis"); *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 441-44 (D.N.J. 2009) (excluding expert's testimony regarding causation where expert "did not undertake a systematic or scientific analysis of all factors to determine the specific effect of any particular piece of advertising (i.e., he did not separate out the effect of any particular piece of advertising, marketplace effects or influences other than alleged false advertising, including true advertising)" and failed to "take into account numerous, or indeed, most relevant factors as to causation."); *see also Verisign, Inc. v. XYZ.com LLC*, 848 F.3d 292, 300-01 (4th Cir. 2017) (upholding exclusion of expert testimony where expert's market share allocation "assume[d] rather than demonstrate[d]" that every lost sale was the result of the alleged false advertising); *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 122 (4th Cir. 2011) (finding that "fatal flaw" in plaintiff's damages calculation was that its expert assumed that every sale of the product at issue was attributable to the alleged false claim).

The Anderson Report also assumes that but for the Challenged Claims, Plaintiffs (as opposed to other non-TrueCar affiliated dealers) would have made every Challenged Sale. This assumption simply is not borne out by economic analysis or the record evidence, including Mr. Anderson's concession that there are "multiple competitors" of Plaintiffs apart from TrueCar dealers in each geographic region.  (*See supra* at 8).  This assumption likewise renders the

Anderson Report invalid.  *See Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 319 (S.D.N.Y. 2009) (excluding under *Daubert* unsubstantiated expert testimony that "in a 'but for' world," plaintiff "would have made each and every one of [the] sales that were made by bottlers or distributors other than [plaintiff]").

As this Court and others have held, "a putative expert who seeks to estimate 'but for' sales cannot rely on his" purported "'industry expertise' or its equivalent as a substitute for a methodology that looks to specific data and proceeds to make statistically or scientifically valid inferences" therefrom.  *Lava Trading*, 2005 WL 4684238, at \*16; *see also Zenith Elecs. Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term.").[9]  To the contrary, experts "must provide some explanation for their conclusions, rather than referring generally to their experience."  *LinkCo, Inc. v. Fujitsu Ltd.*, No. 2002 WL 1585551, at \*2-4 (S.D.N.Y. July 16, 2002).  Yet Mr. Anderson provides no explanation whatsoever for his causation opinions, which are little more than conclusory assertions.  *See In re Gen. Motors LLC Ignition Switch Litig.*, 2017 WL 6729295, at \*8 (S.D.N.Y. Dec. 28, 2017) (rejecting experts who "simply pronounce[d], without further analysis" that their theory of causation was "the likeliest" and who "assume[d] the very conclusion that they [were] trying to prove").

An expert opinion such as Mr. Anderson's that is "speculative or conjectural is not based on a reliable methodology and fails to comply with the standards in Rule 702."  *In re M/V MSC Flamina*, 2017 WL 3208598, at \*5 (S.D.N.Y. July 28, 2017) (citation omitted).  Such

---

[9]    In *Lava Trading*, this Court adopted in full a Report and Recommendation that relied heavily on *Zenith* in finding a similarly speculative methodology "indefensible" under *Daubert*.

testimony "should be excluded" under *Daubert*.  *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21, 22 (2d Cir. 1996).  Indeed, "the district court has the responsibility to exclude an expert opinion that overlooks factors that render the testimony unreliable and/or speculative." *Microstrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1355-56 (Fed. Cir. 2005).   The "[a]dmission of expert testimony based on speculative assumptions is an abuse of discretion." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (citation omitted).  "[C]onclusory opinions — often referred to as *ipse dixit* — [likewise] fail to provide a methodology that would allow a court to assess reliability" and should be excluded on the same basis.  *In re M/V MSC Flamina*, 2017 WL 3208598, at *5.   "[A]n expert's analysis must be 'reliable at every step'" and the exclusion of an expert's opinion is warranted if the expert "lacks 'good grounds' for his or her conclusions."   *Compania Embotelladora Del Pacifico*, 650 F. Supp. 2d at 319 (citation omitted).

Courts in this district routinely reject damages analyses like Mr. Anderson's that are subjective and cannot be verified, *Lava Trading*, 2005 WL 4684238, at *17; that simply layer assumption on top of assumption to arrive at a theory of causation, *see, e.g.*, *Faulkner v. Nat'l Geographic Soc'y*, 576 F. Supp. 2d 609, 619 (S.D.N.Y. 2008) (When expert's analysis "starts with an unsubstantiated assumption . . . and proceeds by nothing more than guesses . . . each baseless step based on the preceding guess," it causes "[the expert's] opinion [to be] grounded only in assumptions, not in facts.   The methodology is anything but reliable.   It is not admissible."); and that are "simply inadequate to support the conclusions reached . . . ." *Amorgianos*, 303 F.3d at 266.

B.     Mr. Anderson Fails to Consider Obvious Alternative Explanations for Sales Made
       by TrueCar-Affiliated Dealers and Lost by Plaintiff-Dealers

Courts have held that "while an expert need not rule out every potential cause in
order to satisfy *Daubert*, the expert's testimony must at least address obvious alternative causes
and provide a reasonable explanation for dismissing specific alternate factors identified by the
defendant." *Israel v. Springs Indus. Inc.*, 2006 WL 3196956, at *5 (E.D.N.Y Nov. 3, 2006); *see
also MTX Commc'ns Corp. v. LDDS/Worldcom, Inc.*, 132 F. Supp. 2d 289, 293 (S.D.N.Y. 2001)
(excluding damage report "which fails to consider important financial information, employs a
speculative variable and relies on unverified information").

Mr. Anderson's failure to address the record evidence of obvious alternative
causes for the Challenged Sales or Plaintiffs' lost sales — or to provide any explanation for
affording such alternative causes no weight — further renders his report unreliable. *See Salon
Fad v. L'Oreal USA, Inc.*, 2011 WL 4089902, at *8 (S.D.N.Y. Sept. 14, 2011) (excluding under
*Daubert* expert evidence that did not "distinguish between lost sales due to a reputational harm
from the false advertising, and lost sales due to other factors unrelated to the false advertising");
*Concordia Pharm., Inc. v. Method Pharm., LLC*, 2016 WL 1464639, at *6 (W.D. Va. Apr. 13,
2016) (failure to "take into account numerous market factors that could have affected [product
sales], and was based on selectively chosen data and unsupported assumptions" rendered expert
opinion inadmissible under *Daubert*); *Nikkal Indus. v. Salton, Inc.*, 735 F. Supp. 1227, 1233
(S.D.N.Y. 1990) (excluding under *Daubert* expert opinion on lost profits in false advertising case
that failed to "provide for the impact of other significant factors" which could have affected
plaintiff's profits, "such as the possible effects on sales of a declining trend in the popularity of
[plaintiff's product], the appearance of several competitors, vigorous price competition and, most
importantly, [plaintiff's] poor marketing strategy").

19

C.    Mr. Anderson's Use of An Average Profit Per-Hood Figure Does Not Fit the Facts of this Case Because it Does Not Take Into Account Plaintiffs' Individual Competitive Environments

Separate and apart from Mr. Anderson's flawed causation assumptions and the conjecture on which his lost profits analysis is based, Mr. Anderson's use of an "average" profit calculation — without even considering each individual Plaintiff-dealer's finances or local market conditions — presents obvious fit problems that render his analysis entirely inappropriate here.  This is not a class action, and each Plaintiff claims individualized damages.  Accordingly, when calculating lost profits, actual financials should be used and not generalized averages.  *Cf. Okraynets v. Metro. Trans. Auth.*, 555 F. Supp. 2d 420, 450 (S.D.N.Y. 2008) (lost compensation calculated by expert who examined plaintiff's actual work and earnings history deemed more persuasive than that of expert who used "historical hours figures for the average worker"); *Otis v. Doctor's Assocs., Inc.*, 1998 WL 673595, at *4 (N.D. Ill. Sept. 14, 1998) (precluding proffered expert's opinion on anticipated lost profits of fast food enterprise where expert failed to establish that average weekly sales estimate had "any basis in fact or fast food market reality," making expert's calculations nothing more "than an exercise in arithmetic based on inherently unreliable values"), *cited in Israel v. Spring Indus., Inc.*, 2006 WL 3196956 (E.D.N.Y. Nov. 3, 2006).[10]

---

[10]    Mr. Anderson contends that $1,602 of average lost profit per Challenged Sale, which is based on his 1:1 ratio calculation, is conservative — in that, for example, it omits other-make sales or sales made outside the search ZIP code — and thus compensates for these other unaccounted-for causal factors.  *See* Anderson Rpt. at 39; Anderson Tr. at 68:9-14 ("The one-to-one ratio we used is actually quite conservative.  If I was estimating it as trying to get the most likely ratio, I would most likely come up with 1 to 1.2 or something like that, but as a conservative ratio, we used one-to-one ratio.").  But that an equally speculative higher profit margin per same-make car sale could have been used does not cure the problem that Mr. Anderson completely ignored causation in his analysis.  *See Reed Const. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 402 (S.D.N.Y. 2014) (expert's counterargument that, if anything, his model would "underestimate damages" was "not responsive to [defendant's] concerns"; failure to address "another unobserved variable" was "significant" flaw which "coupled with other flaws in . . . methodology" rendered model "inadmissible under *Daubert*").

D.   Mr. Anderson's Other Errors are Further Indicia of Unreliability

All of the other problems with the Anderson Report, described above (at p. 10-11) only add fuel to the fire.  Even if each one was not independently sufficient to justify exclusion, their cumulative effect, even apart from the major problems with Mr. Anderson's opinion, provides further evidence of unreliability that justify exclusion under *Daubert*.  *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 603 (S.D.N.Y. 2007) ("cumulative errors" rendered expert survey evidence "inadmissible" "even if each error considered alone might be thought a question of weight" (citation omitted)).

Point 2

MR. ANDERSON'S DISGORGEMENT CALCULATION IS BOTTOMED
ON THE SAME SPECULATIVE ASSUMPTIONS AS HIS LOST PROFITS MEASURE

The disgorgement analysis proffered by Mr. Anderson as an alternative to recovery of Plaintiffs' lost profits fares no better.  Under Section 35(a) of the Lanham Act, "[i]n assessing profits [to be disgorged] the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."  15 U.S.C. § 1117(a).  Mr. Anderson attempted to prove only the 48,184 Challenged Sales derived from his lost-profits analysis.  Thus, his disgorgement calculation is bottomed on the same unfounded assumptions as his lost profits analysis (*see* Ugone Rpt. at 89, ¶ 121) and should be rejected on the same basis. *See Salon Fad v. L'Oreal USA, Inc.*, 2011 WL 4089902, at *11 (requiring plaintiffs to demonstrate "link between the defendants' profits from diversion and the injury" to invoke remedy of disgorgement); *accord Infinity Headwear & Apparel, LLC v. Jay Franco & Sons, Inc.*, 2017 WL 3309724, at *6 (S.D.N.Y. Aug. 2, 2017) (an expert's calculation of disgorgement damages "that presume[s] liability do[es] not, in and of [itself], establish that an injury occurred").

Moreover, as noted above (at p.11) although Mr. Anderson tried to limit his calculation of disgorgement damages only to the Challenged Sales, he implicitly assumes that *all* TrueCar-related new car sales are attributable to the Challenged Claims.  *See* Anderson Tr. at 71-72; Ugone Rpt. at 91, ¶ 123.   But if all TrueCar-related new car sales are included in a disgorgement calculation, all of TrueCar's costs would be variable costs.  Ugone Rpt. at 91, ¶ 124.   And once operating expenses are deducted from gross profits, TrueCar's profits associated with all TrueCar-related new car sales are negative.   *Id*.  Thus, a disgorgement remedy would yield no damages in this matter.

Point 3

MR. ANDERSON'S "ARBITRARY 25% FINE"
CALCULATION DOES NOT FIT THE FACTS OF THIS CASE

As an alternative measure of damages, the Anderson Report calculates "an arbitrary 25% fine percentage, based on its usage by the FTC in certain cases, and as recommended by counsel to the plaintiffs."   Anderson Rpt. at 34.  This damages calculation likewise should be excluded.

"In contrast to a claim for damages that seeks reimbursement for a plaintiff's past expenditures in conducting such advertising that was concurrent with the wrong, an award for corrective advertising to be run in the future has been described as 'an extraordinary remedy reserved for cases in which a plaintiff lack[ed] financial ability to pay for reparative ads.'"   *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04 Civ. 7203 (DLC), 2006 WL 1359955, at *1 (S.D.N.Y. May 18, 2006) (citation omitted).  So extraordinary is this form of relief that there appears to be no record of such an award in this Circuit.  Even if such damages were available, however, they are awarded only where the plaintiff and defendant are direct competitors, which Plaintiffs and TrueCar are not.  *See id.* at *3.  When the products do not compete, "an award of prospective

corrective advertising is not sufficiently tied to compensation for past infringement to be a reliable measure of damages" and "would be nothing more than a windfall." *Id.* Even when the products do compete, the plaintiff "must show that it was financially incapable of undertaking effective concurrent corrective advertising measures to counteract the false ads," *Playtex Prods., Inc. v. Procter & Gamble Co.*, 2003 WL 21242769, at *8 (S.D.N.Y. May 28, 2003), *aff'd*, 126 F. App'x 32 (2d Cir. 2005), and the Anderson Report cites no evidence to that effect.

Further, unlike Lanham Act suits, the FTC can use its "familiarity with the expectations and beliefs of the public, acquired by long experience" to interpret an advertisement without survey proof. *Am. Home Prods.*, 682 F. Supp. at 686; *see also In re Kraft*, 114 F.T.C. 40, 126 (1991) ("It is well settled that the Commission can determine whether a claim is made in an advertisement without resorting to extrinsic evidence even if the claim is implied"). Recognizing these differences, courts have held that FTC precedents and standards are not controlling in Lanham Act cases. *See, e.g.*, *Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 227-29 (3d Cir. 1990). For this separate reason, a remedy predicated on the FTC's remedial approach is not relevant here.

<u>Conclusion</u>

For the foregoing reasons, TrueCar respectfully requests that the Court grant TrueCar's motion to exclude the Anderson Report.

Dated: New York, New York
         January 19, 2018

Kramer Levin Naftalis & Frankel LLP

By: /s/  Harold P. Weinberger
    Harold P. Weinberger
    Norman C. Simon
    Benjamin M. Arrow

    1177 Avenue of the Americas
    New York, NY 10036
    Telephone:  (212) 715-9132
    Facsimile:  (212) 715-8132
    Email:      hweinberger@kramerlevin.com
                nsimon@kramerlevin.com
                barrow@kramerlevin.com

Attorneys for Defendant TrueCar, Inc.

KL3 3152865.9