UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
DEPENDABLE SALES AND SERVICE, INC.,
et al.,

                Plaintiffs,                15-cv-1742 (PKC)

      -against-                  MEMORANDUM
                                           AND ORDER

TRUECAR, INC.,

                Defendant.
-------------------------------------------------------------x

CASTEL, U.S.D.J.

          Plaintiffs are 108 individual automobile dealerships.  They are located throughout the United States and sell cars made by a range of different manufacturers, including Audi, Buick, Chrysler, Ford, Hyundai, Porsche, Subaru, Toyota and others.  Each plaintiff asserts that it was injured when defendant TrueCar, Inc. ("TrueCar") ran advertisements that falsely promised consumers a "no-haggle," no-negotiation car-buying experience, thus diverting business from the plaintiff dealers to TrueCar-affiliated dealers.  Plaintiffs contend that, in truth, consumers who arrived at TrueCar-affiliated dealers were required to negotiate before purchasing their chosen car.  Plaintiffs bring false-advertising claims under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and New York law.

          Discovery is now closed.  TrueCar has moved in limine to exclude the expert report of plaintiffs' damages and causation expert, Patrick Anderson, on the grounds that his analysis is not reliable or relevant under Rule 702, Fed. R. Evid., and Daubert v. Merrill Dow Pharmaceuticals, 509 U.S. 579 (1993).  (Docket # 75.)  This Court held a Daubert hearing on

April 10 and 11, 2018.  Anderson testified at the hearing, as did TrueCar's rebuttal expert, Keith Ugone, Ph.D.  The parties have submitted post-hearing letter-briefs.  (Docket # 92-95.)

In a false-advertising case, it is a plaintiff's burden to demonstrate causation between the misleading advertisements and resulting damages.  Anderson's analysis has several serious flaws related to the causation between TrueCar's advertisements and resulting lost sales to the plaintiffs.  This includes his conclusion that 100% of TrueCar's sales from buyers located in a plaintiff dealer's geographic market were caused by the company's "no-haggle" claim. Because Anderson has not adequately demonstrated causation, the Court concludes that his analysis would not assist a trier of fact, and TrueCar's motion is granted.

SUMMARY OF ANDERSON'S FINDINGS.

Patrick Anderson is a principal in the consulting firm of Anderson Economic Group, LLC, which does extensive work in the automobile industry, and includes consulting with major automobile manufacturers, suppliers and dealers.  (Anderson Rep. ¶¶ 1-3.)

Anderson opined that from 2009 to the first half of 2016, the plaintiff dealers lost a total of 48,184 auto sales to TrueCar-affiliated dealers on the basis of TrueCar's false advertisements, with each sale causing $1,602 in lost profits to the plaintiff dealers.  (Anderson Rep. Table 1.)  In the aggregate, Anderson calculates that plaintiffs lost a total of $77.2 million. (Anderson Rep. Table 1.)

Anderson's conclusion is based on the following analysis.  He opines that when TrueCar promised consumers a "no haggle" experience, prospective buyers were "diverted" from plaintiffs to TrueCar-affiliated dealers in the same geographic market.  (Anderson Rep. 30-31.) He opines that TrueCar's promises of "no haggle" pricing and "guaranteed savings" were

"clearly effective" in drawing customers to purchase new vehicle through TrueCar.  (Anderson Rep. 31.)

To buy a vehicle through TrueCar, a consumer went to the TrueCar website, entered his or her zip code, and was directed to a TrueCar-affiliated dealer.  (Anderson Rep. 31.) TrueCar e-mailed bar-coded coupons, called "Guaranteed Savings Certificates," to prospective buyers, which were "valid for redemption of specified discounts at specified, individual dealer locations."  (Anderson Rep. ¶ 47.)  When a buyer redeemed a certificate at a TrueCar dealer, Anderson opines, that purchase was a gained sale for a TrueCar-affiliated dealer and a lost sale for "the other dealers in the market area."  (Anderson Rep. 31.)

Anderson's damages analysis is directed almost exclusively to the calculation of lost sales incurred by the plaintiff dealers, with alternative damages in the form of disgorgement of TrueCar's lost profits and prospective corrective advertising expenses.  To calculate sales lost by plaintiff dealers, Anderson attempted to link purchases made through TrueCar-affiliated dealers to searches conducted by consumers located in zip codes within plaintiffs' geographic markets.  (Anderson Rep. 31-32 & Table 1.)  Anderson traced same-make sales to specific TrueCar-affiliated dealerships based on consumers' redemptions of the TrueCar certificates. (Anderson Rep. ¶ 109 & Ex. E.)  He defined a plaintiff dealer's geographic market area according to the 30-minute drive-time to a plaintiff dealer.  (Anderson Rep. Ex. E-3 ¶ 6, Ex. E-5.)  In certain instances, he used the geographic market area defined by the manufacturer.  If, for example, a TrueCar-affiliated Buick dealer sold a vehicle to a consumer who searched TrueCar using a zip code in a plaintiff Buck dealer's geographic market, Anderson recorded that transaction as a sale lost by that plaintiff.  (Anderson Rep. Ex. E-3.)  Anderson determined a specific and individualized geographic market tailored to each of the plaintiff dealers.

Next, for each transaction identified as a lost sale, Anderson attributed $1,602 in lost-profits damages to the plaintiff dealer.  (Anderson Rep. Table 1.)  The $1,602 figure reflected "the average net profit per new car sold within a large number of dealers," before taxes, as calculated by the National Automobile Dealers Association ("NADA").  (Anderson Rep. ¶ 112.)  Anderson noted that plaintiffs included both luxury and non-luxury car dealers of varying sizes, located throughout the United States.  (Anderson Rep. ¶ 115.)

In the aggregate, Anderson calculated approximately $77.2 million in lost-sales damages across all of the plaintiff dealers.  He performed separate analyses of each individual plaintiff dealer.  (Anderson Rep. Ex. H.)  For instance, for plaintiff Garber Chevrolet in Midland, Michigan, Anderson identified 31 sales lost to TrueCar-affiliated dealers between 2010 and the first half of 2016, in a geographic market consisting of 21 zip codes within a 30-minute drive time of the dealership.  (Anderson Rep. Ex. H-49.)  Multiplying the 31 lost sales by $1,602 in lost profits per sale (a national-average figure) Anderson opines that there are "Estimated Damages" of $49,653.  (Id.)  For Brentlinger Enterprises in Dublin, Ohio, Anderson identified 21 lost Audi sales to TrueCar-affiliated dealers between 2010 and the first half of 2016, in a geographic market consisting of 60 zip codes, using a manufacturer-defined market.  (Anderson Rep. Ex. H-17.)  Multiplying the 21 lost sales by the same national average of $1,602 in lost profits per sale, Anderson opines that there are "Estimated Damages" of $33,636.  (Id.)

Anderson used a similar approach to calculate alternative disgorgement remedies in the form of revenue gained by TrueCar.  There, he multiplied 48,184 in lost plaintiff sales by TrueCar's $299 commission on sales made by its affiliated dealers, for a total of approximately $13 million.  (Anderson Rep. 34 & Ex. F-4.)

DAUBERT STANDARD.

Rule 702, Fed. R. Evid., states: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

Rule 702 requires "more than subjective belief or unsupported speculation." Daubert, 509 U.S. at 590. A trial court must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Id. at 597. Under Daubert, a district court functions as a "gatekeeper" that reviews the reliability and relevance of an expert's technical, specialized knowledge. Restivo v. Hessemann, 846 F.3d 547, 575-76 (2d Cir. 2017).

"[A] 'trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." Id. at 577 (quoting Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 214 (2d Cir. 2009)). "[T]he district court may consider the gap between the data and the conclusion drawn by the expert from that data, and exclude opinion evidence where the court conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered." Restivo, 846 F.3d at 577 (quotation marks omitted); see also General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert."). But gaps and inconsistencies may often go toward the weight afforded to an expert's opinion and not

admissibility.  Restivo, 846 F.3d at 577.  The ultimate inquiry is whether the expert's methods and opinions are sufficiently reliable to be admitted.  Id.

DISCUSSION.

I.       Anderson's Causation Analysis Does Not Satisfy Daubert.

        A.  False-Advertising Plaintiffs Have the Burden of Showing Causation.

        "[A] plaintiff who establishes false advertising in violation of § 43(a) of the Lanham Act will be entitled only to such damages as were caused by the violation."  Burndy Corp. v. Teledyne Indus., Inc., 748 F.2d 767, 771 (2d Cir. 1984).  "Although a court may engage in some degree of speculation in computing the amount of such damages, particularly when the inability to compute them is attributable to the defendant's wrongdoing, causation must first be established."  Id. (internal citation omitted).  A plaintiff must show that its injury was "caused by or attributable to" the false advertisements, as opposed to a lawful factor, like a defendant's lower prices.  Id. at 773; see also Playtex Prod., Inc. v. Procter & Gamble Co., 2004 WL 1658377, at *6 (S.D.N.Y. July 26, 2004), ("only losses attributable to [defendant's] false advertising, as opposed to lawful competition, may be recovered . . . .") (Pauley, J.).  A damages expert may isolate losses caused by the false advertisements by controlling for "external factors and market forces" and "various lawful promotional activity" that influenced consumers.  Id. at *6-7.

        It is plaintiff's burden to demonstrate that false advertisements resulted in lost sales.  The late Judge Conner dismissed a false-advertising claim as a matter of law where the plaintiff's theory of injury used the "highly questionable premise[ ]" that a product's entire sales decline "is attributable to false and misleading advertising by [defendant]."  Am. Home Prod. Corp. v. Johnson & Johnson, 682 F. Supp. 769, 771 (S.D.N.Y. 1988); see also Salon Fad v.

L'Oreal USA, Inc., 2011 WL 4089902, at *7-8 (S.D.N.Y. Sept. 14, 2011) (concluding that

plaintiffs' methods for identifying causation and injury did not satisfy Rule 23 predominance

when advertisements' effects on consumers raised "inherently an individualized question. . . .

[A] consumer may choose to follow a stylist to a new salon, or to change salons for a host of

reasons that have nothing to do with the false labeling at issue here."); Verisign, Inc. v.

XYZ.COM LLC, 848 F.3d 292, 300-01 (4th Cir. 2017) (affirming district court's exclusion of

damages expert whose "fatal flaw" was to "assume[] rather than demonstrate[]" that plaintiff's

every lost sale was due to defendant's false statements).

> ### B.   Anderson Has Not Made a Showing that the No-Haggle Claim Was Responsible for 100% of TrueCar's Sales.

At the center of Anderson's lost-sales analysis is his unsupported conclusion that

all 48,104 purchases made through TrueCar, rather than a plaintiff-dealer in the buyer's

geographic area, were motivated by the "no-haggle" claim, to the exclusion of any other factor.

Anderson did no consumer research as to the influence of the "no-haggle" claim, did not weigh

the "no-haggle" claim against other features of the TrueCar website and advertising, and did not

account for other market factors that might have led a consumer to purchase from a TrueCar-

affiliated dealership, as opposed to a plaintiff dealership.

Anderson described the "chain of causation" as follows.

First, a consumer encountered TrueCar's advertising online or on television, and

reacted favorably to the promise of a negotiation-free, haggle-free purchasing experience.  (Apr.

10 Tr. 46-47.)

Second, that consumer visited the TrueCar website, entered his or her zip code,

and searched for a vehicle by make and model; the website directed the consumer to a TrueCar-

affiliated dealer and generated a certificate touting a sales price and a calculation of "Guaranteed

Savings" on the vehicle.  (Apr. 10 Tr. 47-49; PX P.)  An exemplar certificate offered by plaintiffs shows a certificate for a silver Toyota Camry to be purchased from a dealership in Van Nuys, California at a "TRUECar Dealer Price" of $22,424, with a "Guaranteed Savings" of $1,371.  (PX P.)  The certificates could vary in detail: some included a vehicle identification number, some had a photo of the vehicle, but, according to Anderson, all certificates included price guarantees "in various forms."  (Apr. 10 Tr. 52-53.)  Anderson expressly testified that the promise of a negotiation-free, haggle-free transaction was the motivation behind all consumers who printed certificates: "Everyone that went and did that obviously did it so they could get negotiation-free savings."  (Apr. 10 Tr. 123.)

Third, when the consumer went to the TrueCar-affiliated dealer, presented the certificate and purchased a vehicle, Anderson attributed that sale as a lost sale to the competing plaintiff dealership, and did so with "an assumption" that the consumer was subjected to negotiation.  (Apr. 10 Tr. 49.)  Anderson testified that he made this assumption "as an expert and someone knowledgeable in the industry."  (Apr. 10 Tr. 49.)  Anderson used a broad definition of what constitutes a negotiation: he testified that if a salesperson offered a sophisticated navigation system or decorative wheels and the consumer declined, that interaction constituted a negotiation that rendered the "no-haggle" claim false (even if the buyer bought the exact car he or she wanted at the exact price quoted by TrueCar) thus causing damage to a plaintiff dealer.  (Apr. 10 Tr. 54-55.)

Summarizing his views, Anderson testified that "there is an unbroken chain of causality.  You go right from the customer's interaction to the advertising.  They identify themselves.  They then take this piece of paper to a dealer.  And then it's not conjectural whether they bought or not, they bought and they paid."  (Apr. 10 Tr. 45.)

Anderson's analysis suffers from the fundamental problem that he fails to support his conclusion that 100% of sales effectuated through TrueCar were motivated by the allegedly false "no haggle" claim.  TrueCar's advertisements touted multiple other features, including research tools showing what other consumers paid for a vehicle's make and model, "transparency" about dealer fees and "[g]uaranteed savings."  (PX E (screenshot of the TrueCar website).)  Anderson did not weigh any of these features.  Similarly, his analysis did not account for the possibility that a consumer might have been influenced by external considerations in deciding to purchase from a TrueCar-affiliated dealer, such as their past interactions with that dealership or the plaintiff dealership, personal recommendations, or non-TrueCar promotions.

Anderson acknowledged that his analysis did not rely on market research about how the "no haggle" claim influenced consumer behavior:

> We, again, didn't do any advertising research, but it is well known in the industry and has been for awhile that the negotiation aspect of buying is something that consumers have anxiety about.

(Apr. 10 Tr. 44.)

Anderson testified that he afforded at least some weight to the so-called Palma study performed in August 2014 by the Palma Companies on behalf of TrueCar.  (E.g., Apr. 10 Tr. 43-44; Anderson Rep. ¶ 54.)  He also testified:

> I'm recognizing that of course people like savings.  But we went through six questions [considered in the expert report] and we did not evaluate advertising.  We didn't interview consumers.  We didn't try to weigh the different messages.  I didn't spend time on the Palma survey.  I looked at the actual behavior of consumers.

(Apr. 10 Tr. 164.)  Anderson broadly summarized the findings of the study as "you know, no negotiation was a pain point" and "that telling people that they could save money without negotiating was a magic bullet, that that really penetrated to consumers."  (Apr. 10 Tr. 44.)  The

Palma study was not prepared in connection with litigation, and its methodology was not described either in discovery or in Anderson's report itself.  Anderson testified that he cited the Palma study "as evidence that TrueCar thought [the no-haggle claim] resonates with consumers. I had plenty of evidence that no haggle was something that consumers were interested in."  (Apr. 10 Tr. 130.)  The survey apparently was taken to "[d]etermine which current messages resonate most strongly" with consumers and to "[e]stablish a messaging hierarchy" for the top 3-5 messages.  (Ugone Report 29.)  Respondents reacted favorably to messages touting "[a] negotiation-free way to save thousands off MSRP on a new car" (70% of respondents), free price reports showing what "others paid for the car you want" (65%), upfront pricing information (56%), the ability to "[s]ave time, save money, and never overpay for your next car" (52%), and average savings of $3,078 off the manufacturer's suggested retail price (48%).  (Ugone Report 29.)

To the extent that Anderson relied on the Palma study, it contradicted his conclusion that 100% TrueCar transactions were motivated by the "no-haggle" claim.  The study found that only 70% of respondents cited to the appeal of "negotiation-free" savings, and that several other factors were identified by a meaningful percentage of respondents.  Anderson acknowledged that he did not weigh these other messages when assessing causation, stating, "I did no separate calculation of lost profits related to that."  (Apr. 10 Tr. 131.)  While the record is insufficient for the Court to make any findings as to the study's reliability, its findings, upon which Anderson has relied, are inconsistent with his analysis.

Anderson's conclusion that the "no-haggle" claim drove 100% of TrueCar's sales from buyers located in a plaintiff-dealer's geographic market is also contrary to the company's sales data before and after its advertisements touting a no-haggle experience.  TrueCar began to

use the "no-haggle" claim in or about 2010 or 2011 and stopped its use on or about March 27, 2016.[1]  (Ugone Report ¶ 59.)  However, a calculation of monthly sales performed by Ugone showed "no discernable, systematic, and/or persistent changes in these TrueCar-related sales" on either end of the promotion.  (Ugone Report Figure 4 & ¶ 61.)  If, as Anderson concluded the "no-haggle" claim was responsible for 100% of TrueCar's sales, there likely would have been observable and significant changes in the sales volume of TrueCar dealers when that claim was dropped from advertisements, after allowing for some period for the dissipation of the effects of its allegedly false claims.  Instead, there was no discernable difference in sales numbers associated with either the commencement or termination of the "no-haggle" promotion.  The data before and after the "no-haggle" advertising was open to some legitimate challenge as to its duration and significance.  But, limited as it may be, it certainly did not support the theory advocated by Anderson.

In a footnote, plaintiffs' post-trial letter-brief states that Anderson was not tasked with performing market research or conducting consumer surveys, and that a separate expert will testify as to "consumer perception."  (Docket # 92 at 4 n.4.)  But plaintiffs then explain that Anderson concluded that the "no-haggle" claim "triggered" damages and that the advertisement drew consumers to TrueCar.  (Id. at 5.)  Plaintiffs do not assert that Anderson's analysis was based on another expert's consumer studies.  Effectively, plaintiffs argue that Anderson should not be scrutinized as an expert on consumer perception, while also relying on Anderson's unsupported conclusion that the "no-haggle" claim was a "'magic bullet' in enticing consumers to use TrueCar's services."  (Id.)  Whether or not he is labeled an expert on consumer perception,

---

[1] Ugone tracked TrueCar sales on the belief that it began to use the "no-haggle" claim on or about October 6, 2011, and, on cross-examination, plaintiffs introduced some evidence that TrueCar used the claim in October 2010.  (Apr. 11 Tr. at 164-68.)  Because there was no observable uptick in sales associated with either date, the precise date is of limited relevance.

Anderson's analysis turned heavily on his conclusion that the no-haggle claim was responsible for all of TrueCar's sales.

Anderson has failed to demonstrate that 100% of sales made through TrueCar were caused by advertisements that falsely promised a "no-haggle" experience.  Again, a plaintiff seeking damages for false advertising must establish causation.  Burndy, 748 F.2d at 771.  TrueCar's motion to preclude Anderson's expert report is therefore granted.

  C. Anderson's Analysis Did Not Account for Sales Channeled from Affinity Partners.

Anderson's causation analysis also failed to weigh that a significant percentage new vehicle sold through TrueCar were transacted through the marketing of TrueCar's so-called "affinity partners."  Companies including American Express and the insurer United Services Automobile Association ("USAA") made TrueCar's services available through their own customer websites and smartphone apps.  (Ugone Report ¶ 52.)  Ugone concluded that USAA alone accounted for approximately one-third of TrueCar's sales volume in 2014, and that TrueCar's other affinity partners accounted for approximately another third.  (Ugone Report ¶ 53.)

Ugone explained that while searches through affinity partners used TrueCar's platform, they were done under the affinity partner's brand, meaning that consumers "likely do not realize they are using TrueCar's services."  (Ugone Report ¶ 54.)  For example, USAA's promotions encouraged consumers to "use the power of USAA to save money on you next vehicle!  . . .  With USAA's Car Buying Service, buying a car is now simple & easy!"  (PX S.)  It described a "USAA Member Price," working with "USAA Certified Dealer(s)," and a "Price Protection Certificate" used to purchase a new vehicle.  (PX S.)  This particular promotion referred to "a TrueCar® Price Report" that described what other consumers paid, but otherwise

did not reference TrueCar.  (PX S.)  The advertisement's text stated, "Your no-haggle, low member pricing is guaranteed on any vehicle you choose."  (PX S.)  This statement was not prominently featured, and appeared with other text under the heading, "Availability."  (PX S.)

Anderson evaluated the USAA-specific promotions no differently than TrueCar-specific ads that more prominently featured the promise of a negotiation-free purchasing experience.  For Anderson's purpose, because each effectuated a new-car purchase via TrueCar, all sales were caused solely by the "no-haggle" claim.

The failure to differentiate between the promotions of TrueCar's affinity partners and those of TrueCar itself further undercuts the reliability and relevance of Anderson's causation analysis and weighs against its admissibility.

### D.  Anderson's Analysis Did Not Adequately Account for Other Competing Dealerships in the Plaintiffs' Geographic Markets.

Anderson's analysis also concluded that any sale made to a TrueCar-affiliated dealer would necessarily have gone to a plaintiff dealer, as opposed to some other dealer in the same geographic market.  Each of the plaintiffs' markets is distinct: some are in densely populated areas with heavy competition, and others have fewer competitors.  However, Anderson's damages analysis concludes that <u>every</u> sale by a TrueCar-affiliated dealer was a sale lost by a plaintiff dealer.  His analysis did not account for the possibility that if TrueCar had not existed or did not make a "no-haggle" claim, the sale may nonetheless have been lost to another competing dealer.

Ugone testified that the automobile industry relies on so-called "pump-in/pump-out" reports, which reflect dealers' sales gained from and lost to competitors in adjacent geographic markets.  (Apr. 11 Tr. 79-87.)  Ugone testified that dealers will often sell vehicles to consumers who reside outside of that dealer's defined market, and likewise lose sales to

consumers who elect to purchase from dealers that are located in an adjacent geographic market. (See id.)  Anderson's analysis did not adequately weigh the likelihood that sales made to a TrueCar-affiliated dealer may have gone to some other competing dealer, other than a plaintiff.

In reviewing Anderson's report, Ugone identified a small number of extreme outliers that nevertheless were counted by Anderson as lost sales.  Anderson calculated damages to one plaintiff dealer located in Maryland based on three TrueCar-related sales in South Dakota, Colorado and Texas.  (Apr. 11 Tr. at 171.)  Apparently, customers located in that plaintiff's Maryland geographic market entered their Maryland zip codes, and TrueCar generated certificates that they used to purchase vehicles in the three far-away states.  (Apr. 11 Tr. at 171-72.)  Ugone credibly observed that tracing those out-of-state sales to loss on the part of a Maryland dealer "sort of do[es]n't make sense," and that a proper damages procedure "would have been to exclude those, and Mr. Anderson did not."  (Apr. 11 Tr. at 172.)

Anderson's causation analysis is flawed in part because it flows from the conclusion that each sale by a TrueCar-affiliated dealer was necessarily a sale lost by a plaintiff, as opposed to some other dealer.  This further weighs against the reliability and relevance of his report.

### E.  Anderson's Analysis Awards Damages to Plaintiffs Who, Themselves, Made Sales through TrueCar.

In his rebuttal report, Ugone concludes that 23 plaintiff dealers were, at some point, TrueCar-affiliated dealers during the claimed damages period of 2009 through mid-2016, and that 19 of those plaintiffs were seeking damages based on sales that they themselves made through TrueCar's allegedly false advertisements.  (Ugone Report ¶¶ 102-03.)  Ugone concludes that for 1,151 claimed lost sales, those sales were in fact made by plaintiff dealers at a time that they themselves were affiliated with TrueCar.  (Ugone Report ¶ 103.)

At the Daubert hearing, counsel to plaintiffs suggested through certain questions to Ugone that TrueCar did not provide plaintiffs with information sufficient to identify which plaintiffs were, themselves, affiliated with TrueCar.  (Apr. 11 Tr. 174-76.)  In the plaintiffs' post-hearing letter-brief, they assert that when TrueCar provided evidence establishing that a plaintiff was a TrueCar-affiliated dealer, those specific plaintiffs stipulated to dismissal.  (Docket # 92 at 17 n.11.)  But any plaintiff dealer asserting injury based on TrueCar's false advertisements would, itself, have known of its own historical affiliation with TrueCar.  Further, the Ugone Report is dated October 23, 2017 – months before the Daubert hearing.  In the time since plaintiffs were served with the Ugone Report, they have not revised or amended Anderson's report to exclude losses claimed by plaintiffs who sold new vehicles through TrueCar.  At the Daubert hearing, plaintiffs did not dispute Ugone's findings that certain plaintiffs claimed damages for sales that they made using TrueCar.

The point is not whether Ugone's figures were accurate in all respects, but they do suffice to dramatically undermine Anderson's analysis.  That Anderson's analysis seeks damages for lost sales on behalf of certain plaintiffs who actually made sales through TrueCar ads weighs heavily against the reliability and relevance of Anderson's report.

II.     Anderson's Across-the-Board Damages Figure of $1,602 Per Lost Sale Is Imprecise.

Anderson's damages analysis also suffers from his use of the single, across-the-board figure of $1,602 in lost sales for each vehicle that went to a TrueCar-affiliated dealer instead of to a plaintiff, whether an Audi sold in Massachusetts or a Hyundai sold in New Mexico.  To reach this $1,602 figure, Anderson calculated the weighted average of net profit per new car sold from 2009 to 2016, as determined by the NADA.  (Anderson Rep. Ex. B-9.)  As explained by Anderson, this reflects data from car dealers collected by the NADA, which is

"recognized as reliable and consistent by our firm and many others in this industry." (Anderson Rep. ¶ 112.) The $1,602 calculation includes dealer expenses and post-sale earnings, including from service, financing and manufacturer bonuses. (Anderson Rep. ¶ 113.)

Anderson acknowledged that individual plaintiffs' profits would vary from the NADA average. At the hearing, Anderson confirmed that the profitability of individual dealer sales can be affected by location, competition from other dealers in the area, brand strength, local economic conditions, inventory and pricing choices. (Apr. 11 Tr. at 17-18.) Anderson testified that he did not make individual adjustments based on these factors "because I had such a large number of dealers over a long, long period of time of time period, and I had such a good data source in the NADA data that that was what I consider and others in the industry consider to be the most reliable data." (Apr. 11 Tr. at 18.)

When asked whether every plaintiff has a net profit for a new vehicle sale of $1,602, Anderson answered, "Of course not." (Apr. 11 Tr. at 21.) Anderson testified that dealers' own statements about profits can be "inconsistent," and need to be scrutinized to consider factors like incentives and whether the dealer's lease is with an affiliated company. (Apr. 11 Tr. at 25-26.) Anderson confirmed that it requires time and attention to make these individualized determinations, and that he has experience in making such individualized determinations. (Apr. 11 Tr. at 26.)

After reviewing financial statements of ten plaintiff dealers, Ugone's report concluded that their average net profits per new vehicle sold fell below the $1,602 figure used by Anderson. (Ugone Report ¶¶ 98-101 & Figure 8.) Ugone selected plaintiffs with the highest number of total lost sales claimed and plaintiffs at or near the median number of 139 lost sales claimed, then reviewed their financial statements. (Ugone Report Figure 8.) Ugone concluded

- 16 -

that a plaintiff Toyota dealer claiming 2,908 in lost sales had an average profit per sale of $407. (Ugone Report Figure 8, 9.)  The plaintiff with the median number of 139 claimed lost sales was a Ford dealer whose average profit per sale was $735.  (Id.)  At the hearing, Ugone did not dispute that there were also instances in which plaintiff dealers' average lost profits exceeded $1,602 per sale.  (Apr. 11 Tr. 95-96.)

Anderson has not persuasively explained the reliability of a single, across-the-board figure for calculating lost profits, which reflects a national average and not the actual losses of any plaintiff.  There are 108 different plaintiffs, selling various makes of cars across a range of geographic markets.  Anderson himself acknowledged that not every plaintiff had a profit-per-sale of $1,602.  (Apr. 11 Tr. at 21.)  He also acknowledged that individualized assessments of dealer profits was possible, albeit difficult.  (Apr. 11 Tr. at 26.)  While "a court may engage in some degree of speculation in computing the amount of such damages," Burndy, 748 F.2d at 771, this cookie-cutter approach consciously uses an average that can vary widely from the actual losses of a given dealer.  The absence of individualized assessment in a case in which 108 unique plaintiffs seek recovery weighs heavily against the reliability and relevance of Anderson's opinion.

THE PARTIES' MOTIONS TO FILE REDACTED SUBMISSIONS ARE GRANTED IN PART AND DENIED IN PART.

Plaintiffs and TrueCar have each filed motions for permission to file redacted versions of their submissions made in connection with this motion.  (Docket # 78, 82.) TrueCar's motion proposes redactions as to three categories of information: : 1.) manufacturer-designated market areas with lists of zip codes and census tracts; 2.) dealer-specific "pump in" and "pump out" data; and 3.) individual plaintiff-dealers' net profits per sale.  Plaintiffs' motion

proposes redactions as to certain deposition transcripts and exhibits that purport to go toward

TrueCar's bad faith in its advertising strategy.

There are both common-law and First Amendment presumptions of public access

to judicial documents.  Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119-20 (2d Cir.

2006).  A court first must determine whether the disputed materials are, in fact, judicial

documents.  Id. at 119.  "[T]he item filed must be relevant to the performance of the judicial

function and useful in the judicial process in order for it to be designated a judicial document."

United States v. Amodeo, 44 F.3d 141, 145 (2d Cir. 1995).  If the item qualifies as a judicial

document, the presumption of access may vary.  Lugosch, 435 F.3d at 119.  Certain submissions

directly affect adjudication, while others are irrelevant.  Id. at 119-20; see also Newsday LLC v.

Cty. of Nassau, 730 F.3d 156, 166-67 (2d Cir. 2013) (weighing "the degree of judicial reliance

on the document in question and the relevance of the document's specific contents to the nature

of the proceeding.").  If there is a presumption of judicial access, courts must weigh disclosure

against "countervailing factors," including "the privacy interests of those resisting disclosure."

Lugosch, 435 F.3d at 120.

"In determining the weight to be accorded an assertion of a right of privacy,

courts should first consider the degree to which the subject matter is traditionally considered

private rather than public.  Financial records of a wholly owned business, family affairs,

illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh

more heavily against access than conduct affecting a substantial portion of the public."  United

States v. Amodeo, 71 F.3d 1044, 1051 (2d Cir. 1995).  "Commercial competitors seeking an

advantage over rivals need not be indulged in the name of monitoring the courts . . . .  The court

should consider the reliability of the information.  Raw, unverified information should not be as readily disclosed as matters that are verified."  Id.

In deciding TrueCar's Daubert motion, the variances between individual dealers' net profits per sale is a relevant issue that goes directly toward Anderson's use of the uniform $1,602 figure for each dealer's lost profits.  Evidence on this issue was highly relevant to the performance of the judicial function and the judicial process, and the parties seek to redact information that the Court has discussed and relied upon in this Memorandum and Order, specifically as to Figure 9 of the Ugone Report.  The presumption of public access to this information is high because it played a direct role in the adjudication of TrueCar's motion.  The plaintiff dealers may have an interest in the privacy of certain commercial data, but they are the ones who elected to bring this action and to pursue a damages theory that turned on net profits per sale.  Their privacy interest in this data is therefore outweighed by the public interest in the transparent adjudication of the theory of loss that they have advanced.

TrueCar's motion to redact is therefore denied as to the submissions that include data on individual dealers' profits per new car sold.

The parties' motions are granted in all other respects.  The general concepts of pump-in/pump-out data and manufacturer-defined geographic markets were broadly relevant to the adjudication of the Daubert motion, but the particulars of any specific market did not go to the core of the judicial function, and the proposed redactions are limited and narrowly tailored.  A member of the public reviewing the parties' redacted submissions on pump-in/pump-out data and manufacturer-defined geographic markets would have information sufficient to understand the parties' arguments and the Court's adjudication.  The presumption of public access to this

information is therefore lower and is outweighed by the parties' interests in confidentiality.  The motion to file redacted submissions as to these issues is granted.

   At this stage, plaintiffs' motion to redact discussion of certain internal TrueCar statements that go toward bad faith is also granted.  The <u>Daubert</u> motion is directed to Anderson's damages analysis and not toward whether TrueCar acted in bad faith when it advanced the "no-haggle" claim.  For the limited purpose of adjudicating the reliability and relevance of Anderson's report, the concept of bad faith was relevant only as background context.  Because evidence of bad faith did not play a judicial function at this time, the presumption of public access is low.  At the same time, the privacy interest in this evidence is also low.  Witnesses' deposition testimony and related e-mails were produced in discovery and implicate the merits of plaintiffs' false-advertising claims.  The fact that this evidence may happen to fall within the parties' protective order is not determinative to public access.  <u>See</u>, <u>e.g.</u>, <u>Newsday</u>, 730 F.3d at 166 ("[F]acts necessary to show good cause for a protective order applicable to discovery documents that are not yet implicated in judicial proceedings will not necessarily meet the higher threshold imposed by the First Amendment with respect to judicial documents.").  Nevertheless, because evidence of bad faith was not relevant to adjudication of the <u>Daubert</u> motion, TrueCar's limited privacy interest in this evidence slightly outweighs the presumption of public access, which, in relation to this motion, is low.  <u>See</u> <u>id.</u> at 166-67 (weighing judicial reliance on a document and the relevance of its contents in the proceeding).

   The parties' motion to file redacted submissions is therefore denied as to information related to individual dealers' net profits per sale, and granted in all other respects.

CONCLUSION.

TrueCar's motion to strike the expert report of Patrick Anderson is granted.

(Docket # 75.)  The parties' motions to file redacted submissions is granted in part and denied in

part.  (Docket # 78, 82.)  The Clerk is directed to terminate the motions.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       May 9, 2018