UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
DEPENDABLE SALES & SERVICE, INC., et
al.,

                     Plaintiffs,                       15-cv-1742 (PKC)

      -against-                          OPINION
                                             AND ORDER

TRUECAR, INC.,

                     Defendant.
------------------------------------------------------------x

CASTEL, U.S.D.J.

        Plaintiffs are 108 new-car dealerships located throughout the United States. They

sell vehicles produced by manufacturers including Audi, Ford, Toyota and others, and are in

different geographic markets across approximately 23 states. They include a Porsche dealership

in East Hartford, Connecticut, a Dodge Chrysler Jeep Ram dealership in Pueblo, Colorado and a

Honda dealership in Florence, Alabama.

        Defendant TrueCar, Inc. ("TrueCar") does not sell cars, and is described by the

parties as a "lead generator." It operates an online platform that places consumers in contact

with a car dealership that contracted with TrueCar. Plaintiffs contend that TrueCar violated the

Lanham Act's prohibition against false advertising by promising consumers a negotiation-free,

haggle-free buying experience through the TrueCar website. According to plaintiffs, instead of

the promised haggle-free experience, customers were channeled toward a TrueCar-affiliated

dealership with a pledge of "guaranteed savings" on vehicles that often were not available on the

dealership's lot. Plaintiffs asset that the consumer would then engage in the negotiation process

typically associated with buying a new car. Plaintiffs also contend that TrueCar's website

generated a graphic called the "TrueCar Curve," which they assert misled consumers about vehicles' pricing data, specifically as to the "factory invoice" price paid by dealers to manufacturers.

Each plaintiff brings a claim of false advertising under the Lanham Act, 15 U.S.C. § 1125. To receive compensatory damages on a false advertising claim, a plaintiff must establish that the defendant's false advertisements injured the plaintiff. See generally Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH, 843 F.3d 48, 65 (2d Cir. 2016). As will be explained, the threshold for showing injury varies depending on the nature of the alleged falsehoods and whether the parties are direct competitors. In a two-player market, where an advertisement makes false comparative statements about a plaintiff's product, injury may be presumed. In a larger marketplace where no false comparisons have been made, the plaintiff must come forward with evidence that demonstrates a loss of sales or an injury to reputation that is attributable to the false statements.

Discovery in this case is now closed and TrueCar moves for summary judgment in its favor. (Docket # 103.) Integral to an understanding of this Court's decision on the summary judgment motion is its previous ruling on a Daubert motion after a two-day hearing. Dependable Sales & Serv., Inc. v. TrueCar, Inc., 311 F. Supp. 3d 653 (S.D.N.Y. 2018). TrueCar asserts that the plaintiffs do not have evidence that, if believed, would permit a reasonable trier of fact to find that any plaintiff was injured by TrueCar's advertisements. In opposition, plaintiffs rely principally on consumer-perception surveys and the deposition testimony of witnesses who testified on behalf of certain plaintiff dealerships. But the consumer-perception surveys go to the issue of the ads' falsity, which is accepted by TrueCar for the purpose of this motion, and the plaintiffs' deposition testimony describes only vague, general perceptions of

injury.  If credited, plaintiffs' evidence would not be sufficient for a reasonable trier of fact to find a link between TrueCar's advertisements and any injury to the plaintiffs.

However, plaintiffs separately urge that summary judgment should be denied because there is evidence that TrueCar's false advertisements were a willful violation of the Lanham Act, and that disgorgement of TrueCar's profits is warranted in the interest of deterrence.  Under the law of the Second Circuit, even where a plaintiff has not demonstrated injury, the equitable disgorgement of a defendant's profits may be ordered in the interests of deterrence if the plaintiff can show that defendant willfully violated the Lanham Act.  See George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1537 (2d Cir. 1992).  Because plaintiffs have come forward with evidence that TrueCar acted against the advice of counsel and willfully ran false advertisements, the summary judgment motion is denied as to a disgorgement-based remedy.

TrueCar's motion for summary judgment is therefore granted in part and denied in part.

BACKGROUND.

A.  Overview of TrueCar's Website.

1.  TrueCar's Role as a "Lead Generator."

TrueCar is a publicly traded company that, in its own words, "provides an online communications platform that allows potential customers to connect with local dealers affiliated with TrueCar."  (Def. 56.1 ¶ 1; Pl. 56.1 Resp. ¶ 1.)  Plaintiffs describe TrueCar as "a lead generator that provides new car sales leads to its TrueCar Certified Dealers and is paid a fee by its affiliated dealers for every new car sale made to a TrueCar generated lead."  (Pl. 56.1 Resp. ¶ 3.)

Consumers interact with TrueCar through a website or a mobile app that allows them to search by vehicle, optional feature and zip code to see prices for new cars in their local geographic market.  (Def. 56.1 ¶ 7; Pl. 56.1 Resp. ¶ 7.)  After a consumer enters that search criteria, the TrueCar site lets prospective buyers release their information to the local TrueCar-affiliated dealer as a way to establish contact.  (Def. 56.1 ¶ 11; Pl. 56.1 Resp. ¶ 11.)  TrueCar does not sell cars directly to consumers and does not own brick-and-mortar dealerships.  (Def. 56.1 ¶ 3; Pl. 56.1 Resp. ¶ 3.)

TrueCar-affiliated dealerships competed with plaintiffs, including for walk-in customers who were not influenced by the TrueCar website.  Indeed, during the period of TrueCar's assertedly false advertising, 23 of the 108 plaintiffs were affiliated with TrueCar.  (Pl. 56.1 Resp. ¶ 26.)  Also, an unspecified number of plaintiffs have an affiliation with other lead-generating platforms, including Edmunds.com and Autotrader.  (Def. 56.1 ¶¶ 5-6; Pl. 56.1 Resp. ¶¶ 5-6.)

2.  <u>Information Shown in the "TrueCar Curve."</u>

The TrueCar site also generated what the parties call the "TrueCar Curve."  (Def. 56.1 ¶ 8; Pl. 56.1 Resp. ¶ 8.)  The "Curve" displayed a "graphical distribution of what others paid for a similar make, model and trim of car."  (Def. 56.1 ¶ 8; Pl. 56.1 Resp. ¶ 8.)  The information displayed on the "Curve" includes data points reflecting the Manufacturer's Suggested Retail Price ("MSRP"), the factory invoice price and average price for a car's make, model and trim.  (Def. 56.1 ¶ 9; Pl. 56.1 Resp. ¶ 9.)  The "Curve" also showed a "proprietary calculation" based on the recent transactions of other TrueCar users, which purports to show what others have paid for similar vehicles.  (Def. 56.1 ¶ 10; Pl. 56.1 Resp. ¶ 10.)  A disclaimer on the website

acknowledged that each dealer set its own prices, and that the "actual purchase price is negotiated between you and the dealer." (Pl. 56.1 ¶ 40; Def. 56.1 Resp. ¶ 40.)

### 3.  The "Guaranteed Savings" Certificate.

The TrueCar site also generated a certificate (the "Certificate") that shows a "guaranteed savings" off the MSRP, which the consumer could then take to a dealer and apply toward the purchase price of a specific make, model and trim of car from a specific dealership. (Def. 56.1 ¶ 12; Pl. 56.1 Resp. ¶ 12.) A sample certificate in the summary judgment record stated that Legacy Toyota in Tallahassee, Florida "guarantees that Customer will save at least $4,608 on ANY in-stock 2013 Toyota Camry L 4-Cyl." (Chudakoff Dec. Ex. 10B.) A "Preferences" column lists an ivory interior color and an exterior color of "Classic Silver Metallic." (Id.)

According to plaintiffs, TrueCar-affiliated dealerships seldom honored the Certificate's terms, and the particular make and model of vehicles searched by consumers were rarely available on the dealerships' lots. (Pl. 56.1 Resp. ¶ 12.) In an internal TrueCar presentation, one of the Company officer's discussed findings that 80% of consumers reported that TrueCar-affiliated dealers did not honor the Certificate price. (Pl. 56.1 ¶ 69; Def. 56.1 Resp. ¶ 69.)

When a TrueCar-affiliated dealership sold a vehicle based on the Certificate, that dealership payed TrueCar a fixed sum, commonly in the amount of $299. (Def. 56.1 ¶ 13; Pl. 56.1 Resp. ¶ 13.) A TrueCar co-founder and former officer has described the Certificate as highly successful in attracting consumer business. (Pl. 56.1 ¶ 39; Def. 56.1 Resp. ¶ 39.) That same individual also described the Certificates as going toward "bullshit virtual vehicle[s]" that

were seldom available on dealer lots.  (Pl. 56.1 ¶¶ 42-43; Def. 56.1 Resp. ¶¶ 42-43; Chudakoff

Dec. Ex. 10A.)

### B.  TrueCar's Advertisements Touting a Negotiation-Free, Haggle-Free Buying Experience.

Plaintiffs contend that TrueCar violated the Lanham Act's prohibition against

false advertising through advertisements that promised a negotiation-free, haggle-free purchasing

experience.  According to plaintiffs, these advertisements were literally false within the meaning

of the Lanham Act because a consumer using TrueCar would be subject to a typical sales

negotiation once they arrived at a TrueCar-affiliated dealership.  For the purposes of this motion,

TrueCar does not dispute the issue of literal falsity for these advertisements.

In approximately 2010 or 2011, TrueCar began a nationwide advertising

campaign that told consumers that TrueCar's services provided "guaranteed savings" without

"negotiation" or "haggling."  (Def. 56.1 ¶ 14; Pl. 56.1 Resp. ¶ 14; Pl. 56.1 ¶ 35; Def. 56.1 Resp.

¶ 35.)  The ads ran on television, radio and online sites, including social media, and they directed

consumers to TrueCar's website.  (Def. 56.1 ¶ 15; Pl. 56.1 Resp. ¶ 15; Pl. 56.1 ¶ 38; Def. 56.1

Resp. ¶ 38.)  The summary judgment record includes a screenshot from the TrueCar website with

prominent text that states: "Car buying that shows you what others paid, so you never overpay.

Upfront pricing info.  Guaranteed savings.*  No negotiation."  (Chudakoff Dec. Ex. 12C.)[1]

TrueCar also points to a television commercial, which is publicly available online, called "Mike

and Craig One Upped," in which a man expresses disdain for the car-buying process.[2]

(Weinberg Reply Dec. Ex. 1.)  He states in part, "It's a lot of haggling and it takes so long."  A

---

[1] The footnoted text accompanying the asterisk states in part, "Guaranteed Savings currently not available in all states."  (Chudakoff Dec. Ex. 12C.)
[2] See https://www.youtube.com/watch?v=PmaO7stZpkI (last visited March 26, 2019).

second individual describes his more positive experience using TrueCar, and states: "Because I used TrueCar, there was no haggling about the price."

TrueCar's market research concluded that a promise of "no negotiation" was a "magic bullet for people" because negotiations were generally challenging to consumers. (Pl. 56.1 ¶¶ 46, 51; Def. 56.1 Resp. ¶¶ 46, 51.) On or about March 27, 2016, TrueCar stopped advertising a haggle-free buying experience. (Def. 56.1 ¶ 18; Pl. 56.1 Resp. ¶ 18.) As noted, during the period that TrueCar was running its allegedly false advertisements, 23 of the 108 plaintiffs in this case were affiliated with TrueCar for at least some period of time. (Def. 56.1 ¶ 26; Pl. 56.1 Resp. ¶ 26.)

TrueCar's outside counsel advised the Company against using the "No Negotiation" claim in its advertisements for reasons including lack of clarity, concerns with regulators and the likelihood that dealers and consumers would negotiate. (Pl. 56.1 ¶¶ 68, 71, 73; Def. 56.1 ¶¶ 68, 71, 73.) It is undisputed that TrueCar's CEO chose to proceed with the advertisements after receiving legal advice not to do so. (Pl. 56.1 ¶ 72; Def. 56.1 ¶ 72.)

C. Plaintiffs' Claim Concerning the "TrueCar Curve."

Plaintiffs separately bring a false advertising claim directed to the "Curve" displayed on TrueCar's site, to the extent that it showed a "TrueCar Price" that is lower than a "factory invoice" price. (Def. 56.1 ¶ 19; Pl. 56.1 Resp. ¶ 19.) According to plaintiffs, the "Curve" implied that the dealer paid a factory invoice price and misled consumers into thinking that TrueCar allows them to pay "less than the dealer paid." (Def. 56.1 ¶ 19; Pl. 56.1 Resp. ¶ 19.)

The "Curve" has been revised over time. For example, before August 2012, it displayed both a "factory invoice" price and a separate "dealer cost" data point. (Def. 56.1 ¶ 20;

Pl. 56.1 Resp. ¶ 20.)  The parties dispute how the term "factory invoice" is understood.  TrueCar urges that within the auto industry, the term does not refer to a dealer's cost in buying a car, while plaintiffs argue that consumers understand the phrase "to mean just that."  (Def. 56.1 ¶ 21; Pl. 56.1 Resp. ¶ 21.)  TrueCar points out that a disclaimer on its web site and app defines the term "factory invoice" as the price a manufacturer initially charges a dealer, excluding discounts, dealer incentives and money allocated to the dealer upon a sale.  (Def. 56.1 ¶ 22; Pl. 56.1 Resp. ¶ 22.)  Plaintiffs assert that this definition was not conveniently displayed or easily accessible to consumers.  (Def. 56.1 ¶ 22; Pl. 56.1 Resp. ¶ 22.)

        D.  <u>Procedural History.</u>

This action was commenced on March 9, 2015.  (Docket # 1.)  The First Amended Complaint brings claims of false advertising under the Lanham Act, as well as state law claims alleging unfair competition under New York common law and "other comparable state common laws," and deceptive business practices under the New York General Business Law "and other comparable state laws."  (Docket # 23.)  Subject matter jurisdiction is premised on federal question jurisdiction, 28 U.S.C. § 1331, and supplemental jurisdiction is invoked for the state law claims, 28 U.S.C. § 1367.  (Am. Compl't ¶ 170.)  The Complaint does not invoke diversity jurisdiction.

The Court granted in part and denied in part TrueCar's motion to dismiss the Complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P.  <u>Dependable Sales & Serv., Inc. v. TrueCar, Inc.</u>, 2016 WL 79992 (S.D.N.Y. Jan. 6, 2016).

The case proceeded to discovery.  TrueCar notes that it took depositions of all plaintiff dealerships.  (Def. 56.1 ¶ 27; Pl. 56.1 Resp. ¶ 27.)  The parties have submitted excerpts

of deposition transcripts for certain plaintiffs, with the excerpts largely reflecting the dealerships' perceptions of injuries attributable to TrueCar's advertisements.

As will be discussed in greater detail, after the close of discovery, TrueCar moved in limine to strike the expert report of Patrick Anderson. Anderson proposed a method to show plaintiffs' lost profits based on sales made by TrueCar-affiliated dealers located in plaintiffs' respective geographic markets that were traceable to a TrueCar Certificate. After a two-day Daubert hearing, the Court concluded that Anderson's methodology failed to demonstrate injury and causation between TrueCar's allegedly false advertisements and the resulting lost sales claimed by any plaintiff dealership, and accordingly granted TrueCar's motion to strike the report. Dependable Sales & Serv., Inc. v. TrueCar, Inc., 311 F. Supp. 3d 653 (S.D.N.Y. 2018).

SUMMARY JUDGMENT STANDARD.

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248). On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant." Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014).

It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law. Vt. Teddy Bear Co. v. 1-800 Beargram

Co., 373 F.3d 241, 244 (2d Cir. 2004). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Id. In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)). A court "may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted).

DISCUSSION.

I.  Plaintiffs Have Not Come Forward with Evidence that Would Permit a Reasonable Trier of Fact to Find that They Were Injured by TrueCar's Advertisements.

A.  Because Plaintiffs Do Not Compete Directly with TrueCar and TrueCar's Advertisements Were Not Comparative in Nature, Plaintiffs Must Come Forward with Evidence of Injury and Causation.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides for civil liability if a defendant's commercial advertising misrepresents the "nature, characteristics, qualities, or geographic origin of his or her or another person's good, services, or commercial activities . . . ." To prove liability, "a plaintiff must establish that the challenged message is (1) either literally or impliedly false, (2) material, (3) placed in interstate commerce, and (4) the cause of actual or likely injury to the plaintiff." Church & Dwight, 843 F.3d at 65.

Under the Lanham Act, injury is typically demonstrated where a plaintiff can demonstrate harm to its "commercial interest in reputation or sales." Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 132 (2014). "[A] plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." Id. at 133.

Under Second Circuit authority, the threshold required to show injury differs based on the nature of the advertisements and the parties' roles as competitors. Where a plaintiff's claim is directed to "misleading, non-comparative commercials," the injury "accrues equally to all competitors; none is more likely to suffer from the offending broadcasts than any other." McNeilab, Inc. v. Am. Home Prods. Corp., 848 F.2d 34, 38 (2d Cir. 1988). Therefore, where the advertisement does not refer to a competing product or make a comparative claim, "'some indication of actual injury and causation' would be necessary in order to ensure that a plaintiff's injury is not speculative." Merck Eprova AG v. Gnosis S.p.A., 760 F.3d 247, 259 (2d Cir. 2014) (quoting McNeilab, 848 F.2d at 38). The Second Circuit has "'expressly disfavored presumptions of harm in cases where the products are not obviously in competition or where the defendant's advertisements make no direct reference to any competitor's products' . . . ." Merck, 760 F.3d at 259 (emphasis in original; quoting Ortho Pharm. Corp. v. Cosprophar, Inc., 32 F.3d 690, 696 (2d Cir. 1994)). In Lexmark, the Supreme Court described the diversion of sales from a direct competitor as "the paradigmatic direct injury from false advertising," but added that other injuries are cognizable under the Lanham Act, provided a plaintiff can ultimately come forward with "evidence of injury proximately caused by [defendant's] alleged misrepresentations." 572 U.S. at 138, 140 (emphasis in original). "To be sure, a plaintiff who does not compete with the

defendant will often have a harder time establishing proximate causation." Id. at 136; see also Infinity Headwear & Apparel, LLC v. Jay Franco & Sons, Inc., 2017 WL 3309724, at *6 (S.D.N.Y. Aug. 2, 2017) (to defeat summary judgment, a plaintiff "must show that the 'defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects.'") (Oetken, J.) (quoting Lexmark, 134 S. Ct. at 1392).

By contrast, where the advertisement makes a materially false comparison to a specific, competing product, the false ad "necessarily diminishes" the competing product in the minds of consumers, and "injury may be presumed, because there was not the same concern of awarding damages for merely speculative injury . . . ." Merck, 760 F.3d at 259. That is because there is a "'logical causal connection between the alleged false advertising and [plaintiff's] own sales position.'" Church & Dwight, 843 F.3d at 71 (quoting Johnson & Johnson v. Carter-Wallace, Inc., 631 F.2d 186, 190 (2d Cir. 1980)). A plaintiff may also be entitled to the presumption "in the context of a two-player market . . . ." Merck, 760 F.3d at 260-61.

Plaintiffs urge that the Court has some discretion to adjust the showing required to demonstrate injury, and point to language in Ortho recognizing that courts may take a "flexible approach" toward proof of injury and causation. 32 F.3d at 694. Ortho observed that "[t]he type and quantity of proof required to show injury and causation has varied from one case to another depending on the circumstances." Id. But its ensuing discussion is consistent with the later formulations of Merck and Church & Dwight: Ortho explained that advertisements that "do not draw direct comparisons," or products "that are not obviously in competition," will "require a more substantial showing" of injury. Id. Harm may be presumed, however, when there has been a misleading advertisement about a competing product. Id. (citing McNeilab, 848 F.2d at 38). Ortho ultimately affirmed the district court's findings, following a bench trial, that that plaintiff

did not establish injury based on its failure to demonstrate a "necessary link" between defendant's false advertisements and altered consumer behavior resulting in lost sales. 32 F.3d at 695-97. Indeed, Ortho based its reasoning in part on "the general rule in our Circuit against making presumptions of injury and causation favorable to the plaintiff . . . ." Id. at 697. Plaintiffs also point to language that they urge requires only a lesser showing of "likely" competitive injury, but "likely" injury is weighed for preliminary injunctive purposes, and even there, "something more than a plaintiff's mere subjective belief that he is injured or likely to be damaged is required before he will be entitled even to injunctive relief." Johnson & Johnson, 631 F.2d at 189.

Here, plaintiffs acknowledge that TrueCar's advertisements do not make comparative claims about the plaintiff dealerships. (Def. 56.1 ¶ 25; Pl. 56.1 Resp. ¶ 25.) The plaintiffs and TrueCar also occupy different positions in the marketplace. Plaintiffs sell new cars directly to consumers through brick-and-mortar dealerships, while TrueCar does not sell cars at all. (Def. 56.1 ¶¶ 2-3; Pl. 56.1 Resp. ¶¶ 2-3.) Plaintiffs describe TrueCar as "a lead generator that provides new car sales leads to its TrueCar Certified Dealers and is paid a fee by its affiliated dealers for every new car sale made to a TrueCar generated lead." (Pl. 56.1 Resp. ¶ 3.) Like TrueCar, other online and offline services market new cars, and many of the plaintiff dealerships (although, plaintiffs state, fewer than half) are affiliated with non-TrueCar marketers including Edmunds, cars.com and Autotrader. (Def. 56.1 ¶¶ 5-6; Pl. 56.1 Resp. ¶¶ 5-6.)

There is some evidence that TrueCar's former CEO, Scott Painter, perceived the Company as competing with dealerships not affiliated with TrueCar. Painter publicly stated in a newspaper interview that TrueCar competes with non-TrueCar dealers. (Pl. 56.1 ¶ 44; Def. 56.1 Resp. ¶ 44; Chudakoff Dec. Ex. 9A.) That article, which was published in the Los Angeles

Times on July 2, 2015, included a Q&A with Painter about TrueCar's business tensions with certain dealers. (Chudakoff Dec. Ex. 9A.) Painter was asked, "Whom do you compete with?" He answered:

> When people think about TrueCar they think our competition is folks like Edmunds.com or Kelley Blue Book. That's not how we view it. They don't have our same business model. We can be happy with customers going to these sites to get information and then coming to us when they are ready to buy. Our competition is the non-TrueCar dealers.

(Id.) In his deposition, Painter testified that his words were "regrettable" and "not true. It was said in an emotional moment in reaction to what was going on at the time. And, again, if I could unsay it, I would unsay it, because it's not an accurate statement." (Painter Dep. 280.)

Similarly, in an article published in Automotive News on July 9, 2015, which discussed the termination of the business relationship between TrueCar and "the country's largest new-car retailer," Painter stated that the situation "just turned into, in a very real sense, a choice for the consumer," and that "[i]t really makes them our competition." (Chudakoff Dec. Ex. 9B.)

Neither side has explained the weight, if any, that should be afforded to Painter's published remarks. Plaintiffs merely note the remarks' existence (Opp. Mem. at 20), and TrueCar states that the remarks were "mistaken[]" but "corrected under oath at his deposition . . . ." (Reply at 2 n.2.) Drawing every reasonable inference in favor of plaintiffs, the Court concludes that Painter's remarks are some evidence that TrueCar perceived itself to be in competition with dealerships that were unaffiliated with TrueCar.

But without more, the context of these remarks and their broad, conclusory nature are insufficient to permit a reasonable finder of fact to conclude that TrueCar was a direct competitor of the plaintiff dealers, such that plaintiffs are not required to demonstrate injury and

causation under <u>Lexmark</u> and Second Circuit precedent. TrueCar and the 108 plaintiff dealerships are participants in the broad marketplace for the sale of new cars, but the fact that the dealerships and TrueCar all are involved in the sales of new cars do not make them direct competitors. TrueCar is a "lead generator" for sales that touted services and informational resources available for prospective car buyers, and plaintiffs are direct sellers of cars. In the market of any one plaintiff-dealer, there are multiple dealerships, and multiple third-party marketing platforms that exist online and offline. A sale made through TrueCar is not necessarily a sale lost by a plaintiff dealership, as opposed to some other competing dealership in the same market. Here, because TrueCar and the plaintiffs are "<u>not obviously in direct competition</u>" and TrueCar's advertisements make "no direct reference" to the plaintiff dealerships, there is no presumption of harm to the plaintiffs. <u>Merck</u>, 760 F.3d at 259 (emphasis in original); <u>see also</u> <u>Ortho</u>, 32 F.3d at 694-95 (affirming conclusion that doctor-prescribed skincare product and over-the-counter product were not direct competitors based on absence of evidence about the competitive landscape).

Therefore, in order to demonstrate that plaintiffs' injuries are not speculative, they must come forward with "some indication of actual injury and causation . . . ." <u>Merck</u>, 760 F.3d at 259 (quotation marks omitted). Where a plaintiff "operates in a large market" that includes numerous types of retailers, injury "may well be difficult to prove" where it "depends upon the idea that [plaintiff's] sales are specifically affected by [defendant's] behavior." <u>Famous Horse Inc. v. 5th Ave. Photo Inc.</u>, 624 F.3d 106, 115 (2d Cir. 2010), <u>abrogated on other grounds by Lexmark</u>. To show injury, plaintiffs "must submit specific evidence that the defendant's advertising causes direct harm to the product[s] in which the plaintiff[s] claim[ ] a pecuniary interest." <u>PDK Labs, Inc. v. Friedlander</u>, 103 F.3d 1105, 1112 (2d Cir. 1997).

B.  TrueCar's Successful *Daubert* Motion Directed to Patrick Anderson.

As noted, at the close of discovery, TrueCar moved to exclude the testimony of plaintiffs' expert Patrick Anderson.  TrueCar urged that Anderson's analysis, as reflected in his expert report, was not reliable or relevant under Rule 702, Fed. R. Evid., and Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993).  The Court held a two-day Daubert hearing, and, in a Memorandum and Order of May 9, 2018, concluded that Anderson's proposed methodology failed to demonstrate causation between TrueCar's allegedly false advertisements and the resulting lost vehicle sales claimed by any plaintiff dealership.  311 F. Supp. 3d 653.

Anderson opined that TrueCar had broadly injured all 108 plaintiffs because it facilitated the sale of 48,104 new cars to affiliated dealers that competed in the same geographic markets as the plaintiff dealerships.  Id. at 659.  Anderson attributed each TrueCar-generated sale in plaintiffs' respective markets as a sale lost by a plaintiff dealership based on TrueCar's false advertising.  Id. at 659-62.  He then multiplied the 48,104 figure by $1,602, a sum that he calculated to reflect a weighted average of net profits per new car sold between 2009 and 2016. Id. at 664-65.

The Court concluded that Anderson's analysis had "several serious flaws related to the causation between TrueCar's advertisements and resulting lost sales to the plaintiffs."  Id. at 656-57.  It concluded that Anderson failed to support his conclusion that all 48,104 new-car sales made through TrueCar reflected sales lost by plaintiff-dealerships in the buyer's geographic area, or that the loss of those sales could be attributed to TrueCar's allegedly false advertisements.  Id. at 660-62.  The Court observed that Anderson conducted no research that showed a causal nexus between the advertisements and a sale lost by any plaintiff, did not weigh the "no-haggle" claim against other features on the TrueCar site, did not account for other factors

that influenced a consumer's choice of dealerships, and did not consider what portion of TrueCar-generated sales could have gone to other competing dealerships in the same geographic markets.  Id. at 660-63.

At the time that the Daubert motion was submitted, plaintiffs stated that without Anderson's testimony, "there is no way to identify those sales diverted from Plaintiffs' markets, and no way to calculate harm on a dealer-by-dealer basis."  (Def. 56.1 ¶ 32; Pl. 56.1 Resp. ¶ 32.)

### C.  In Opposition to TrueCar's Motion, Plaintiffs Have Not Come Forward with Evidence of Injury.

As noted, a plaintiff is injured by false advertisements that cause injury to its "commercial interest in reputation or sales."  Lexmark, 572 U.S. at 132.  In opposition to TrueCar's motion, the plaintiffs have not come forward with evidence that, if believed, demonstrates that sales were diverted from their dealerships or their dealers' reputations were injured.  Because plaintiffs have not pointed to evidence that would permit a reasonable trier of fact to find injury, TrueCar's motion for summary judgment is granted on the issue of injury.

### 1.  The Studies Offered by Plaintiffs Go Toward the Unchallenged Issue of Falsity, Not Injury.

Plaintiffs argue that they have conducted consumer surveys that demonstrate the "necessary link" between TrueCar's ads promising a negotiation-free experience and plaintiffs' lost sales.  Ortho, 32 F.3d at 695-97.  They point to a consumer-perception study conducted by Philip Johnson, who designed and conducted surveys that tested consumer responses to TrueCar's advertisements promising a haggle-free buying experience.  (Chudakoff Dec. Ex. 14.)

Johnson is president of JJG Group, LLC, a company that specializes in litigation-related market research.  (Johnson Rep. ¶ 1.)  From July 26 to September 15, 2016, Johnson designed and conducted a double-blind, online survey of 418 current and prospective new-car

purchasers and recorded their reactions to two TrueCar television commercials: "I Wonder How Much This Costs" and "Mike and Craig One Upped." (Johnson Rep. ¶ 7, 25.) When asked to describe in their own words the main messages of the commercials, respondents' top answers were 1.) "Use/Buy from TrueCar/App" (78%); 2.) "Know Exact/Real/Actual Price/What You Pay" (59%); 3.) "Better Price/Good Deal/Low Price" (30%); 4.) "No Hassle/Quick/Easy Experience" (26%); and 5.) "No Negotiating/No Haggling (net)" (18%). (Johnson Rep. ¶ 27.) When specifically asked whether the commercial said or suggested anything about the price that a TrueCar user would actually pay, 63% answered that it did; 42% of those who answered in the affirmative stated that the ad promised "Know Exact/Real/Actual Price/What You Pay" and 7% answered "No Negotiating/No Haggling." (Johnson Rep. ¶¶ 28-29.) When asked whether the commercial conveyed a message about haggling or negotiation, 63% answered in the affirmative, of which 52% said that the commercial touted no haggling or negotiation. (Johnson Rep. ¶¶ 30-31.)

Johnson states that when all responses are aggregated, 55% of respondents who screened the "I Wonder How Much This Costs" commercial concluded that it had a message of "No Negotiating/No Haggling." (Johnson Rep. ¶ 36.) Johnson states that as to aggregated responses for the "Mike and Craig One Upped" commercial, 64% of respondents "take away the message that there will be no negotiating or haggling at a TrueCar-affiliated dealer." (Johnson Rep. ¶ 46.)

Plaintiffs urge that Johnson's consumer surveys are evidence that would permit a reasonable trier of fact to find injury to the plaintiff dealerships. But Johnson's surveys did not measure the advertisements' effects on consumer behavior, or connect the purported falsity of TrueCar's ads to the injury of any plaintiff. Indeed, the Johnson Report describes the survey's

purpose as going to the issue of "whether the television commercials falsely communicate" a haggle-free buying experience and guaranteed savings, and does not mention consumer behavior or injury as the purpose of the study. (Johnson Rep. ¶ 5.) For the purposes of this motion, however, TrueCar does not dispute the literal falsity of the ads.

Johnson's conclusions are not evidence of a "causative link" between TrueCar's ads and any lost sales suffered by plaintiffs. Plaintiffs point to the Second Circuit's decision in Coca-Cola Co. v. Tropicana Products, Inc., which linked consumer perception of a television commercial's falsity to "the risk of irreparable harm" in changing consumers' purchasing decisions. 690 F.2d 312, 317 (2d Cir. 1982). But in that case, the two products were "the leading national competitors for the chilled (ready-to-serve) orange juice market," and the dispute arose in the context of a motion for preliminary injunctive. Id. At that stage, it was sufficient to demonstrate that the plaintiff "probably would suffer irreparable injury." Id.; see also S.C. Johnson & Son, Inc. v. Clorox Co., 241 F.3d 232, 238 (2d Cir. 2001) (in granting preliminary injunctive relief, the literal falsity of a comparative ad demonstrates irreparable harm). Here, TrueCar is not a direct competitor of the plaintiff dealers, its ads are not comparative, no preliminary injunction is at issue, and there is no legal presumption that a false advertisement would necessarily result in lost sales to plaintiffs: plaintiffs instead must come forward with "some indication of actual injury and causation . . . ." Merck, 760 F.3d at 259.

Other authorities cited by plaintiffs discussed whether surveys similar to Johnson's were evidence of and advertisement's falsity, as opposed to evidence that the ads injured the plaintiff. Church & Dwight, 843 F.3d at 68-70; Procter & Gamble Co. v. Ultreo, Inc., 574 F. Supp. 2d 339, 345 (S.D.N.Y. 2008) (Sullivan, J.). Again, for the purposes of this motion, falsity is not in dispute.

The Johnson Report tends to demonstrate the falsity of TrueCar's advertisements. But it is not evidence of injury to plaintiff dealerships flowing from TrueCar's ads.

Plaintiffs also point to a 2015 consumer satisfaction study that TrueCar commissioned from an outside research company, Strategic Vision. The study was commissioned for internal use, and its findings were summarized in a series of slide decks. (Chudakoff Dec. Ex. 12B.) It found that 29% of survey respondents did not receive the savings guaranteed by TrueCar. (Pl. 56.1 ¶ 56; Def. 56.1 Resp. ¶ 56.) As with the Johnson Report, these findings go to the falsity of the advertisements, not the injury incurred by plaintiffs as a result of the ads.

The Court therefore concludes that the Johnson Report and the Strategic Vision findings would not permit a reasonable trier of fact to find that plaintiffs were injured by TrueCar's advertisements.

2. The Deposition Testimony Cited by Plaintiffs Is Not Evidence of Injury.

As noted, the plaintiffs are 108 separate car dealerships, each of which claims that it was injured by TrueCar's false advertisements. This is not a class action. An individual plaintiff may come forward with evidence of injury caused by TrueCar's advertisements.

To show injury, plaintiffs point to the deposition testimony of four witnesses who testified on behalf of plaintiff dealerships. The testimony of a witness describing lost sales or reputational injury incurred by a particular dealership could be evidence that is sufficient to defeat TrueCar's summary judgment motion as to that individual dealership. In each instance, however, the witness articulated only a vague impression of lost sales and damage to reputation,

and did not identify a discernable harm that would permit a reasonable trier of fact to find injury.[3]

Matthew Konker was asked by TrueCar whether he had evidence that the allegedly false ads affected the two Garcia dealerships. (Chudakoff Dec. Ex. 16H.) Konker answered, "It would affect them financially and obviously reputationwise." (Id.) He stated that by promising a negotiation-free experience and suggesting that a car could be purchased for less than factory invoice price, the ads indicated:

> So what do you think of us? Probably a little bit less that we're still that evil car dealer, whatever you want to call it.
>
> It also affects the possibility of sales and our reputation with our manufacturer because every time one of those customers doesn't buy a car from us or doesn't show up for opportunity to purchase a car for us, it can put us in a worse light with them.
>
> I think we know how the old downhill roll – you don't get the first customer, you don't get the trade-in. You don't get the second one, you don't get a referral. You don't get their family members.

(Id.)

Nicholas S. Lochmandy, whose job title and dealership have not been identified, was asked to describe the injuries caused by TrueCar's advertisements. (Chudakoff Dec. Ex. 16J.) He stated:

> I can't think of all the ways, but there are many ways. Lost sales, having to inform someone with a TrueCar certificate. Sometimes they bring them in. So we would lose profits that way.
>
> Sometimes we can't match that price, meaning we lost the sale.

---

[3] In directing the Court to this testimony, plaintiffs do not identify the dealerships on whose behalf these witnesses were testifying. From the transcript excerpts submitted by plaintiffs, the Court cannot discern these witnesses' job titles, and has been able to identify the dealership affiliation of only one witness: It appears that Matthew Konker testified on behalf of plaintiffs Garcia Imports, Inc. d/b/a Garcia Honda and Garcia Infiniti, both of which are located in Albuquerque, New Mexico. (Am. Compl't ¶¶ 151-52; Konker Dep. 55.)

> Sometimes they never come in.  They go to that TrueCar dealer.  That is a loss of the sale.  The trade-ins we don't have the opportunity to bring in.  The service work the customer would have over the life of a car.  Damage to our reputation.  That's all I can think of.

(Id.)

Kevin Murphy, whose job title and dealership have not been identified, testified of the ads: "They hurt us financially.  Then they hurt our reputation."  (Chudakoff Dec. Ex. 16K.)  He stated:

> If they're luring customers away from myself, I'm not getting a chance to – to earn their business.  . . .  In my years of being in this business, I would – I would know that if you are advertising to people that they could buy a car below cost and, you know, there's going to be no negotiating whatsoever, that, absolutely, people – some portion of the population are definitely going to respond to that.  Absolutely.

(Id.)

Clinton Soutar, whose job title and dealership have not been identified, testified, "I believe it lost me sales of cars and in turn opportunities for the sale of service contracts, GAP, LoJack, other finance products, the trade-in on the car they would have bought, future service work and the loss of a customer for life."  (Chudakoff Dec. Ex. 16N.)  As to the factory-invoice claim, Soutar testified, "You know, I think the average consumer hears factory invoice is going to believe that's the price that was paid for the vehicle or the television set or the motorcycle or the TV, when that's – I don't know in other industries but in the car industry the factory invoice price is not the price paid for the car by any means at all."  (Id.)

None of the four witnesses described an incident where they knew of an actual sale lost to a TrueCar-affiliated dealership.  They also did not describe evidence of harm to the business reputation of their respective dealerships: Konker speculated only that customers would

"[p]robably [think] a little bit less that we're still that evil car dealer, whatever you want to call it." (Chudakoff Dec. Ex. 16H.) The other witnesses either did not mention injury to reputation or did so without elaboration.

As TrueCar notes, other witnesses testifying on behalf of plaintiff dealerships acknowledged that there are multiple reasons unrelated to the claimed false advertisements that would prompt a consumer to buy from a TrueCar-affiliated dealer. One witness stated that "[t]here's a thousand reasons," including location, convenience and pricing. (Weinberger Reply Dec. Ex. 2A.) Another testified that there are "hundreds" of reasons that influence a purchase, including "[s]ervice, liking the salesperson." (Weinberger Reply Dec. Ex. 2R.)

At most, the testimony offered by plaintiffs describes witnesses' perceptions of the ads' falseness and why the false statements could be material to consumers' buying choices, but they do not identify discernable injury to the dealerships linked to TrueCar's advertisements. To defeat summary judgment, a plaintiff "must submit specific evidence that the defendant's advertising causes direct harm to the product in which the plaintiff claims a pecuniary interest." PDK Labs, 103 F.3d at 1112; accord Merck, 760 F.3d at 259 (evidence is required "to ensure that a plaintiff's injury is not speculative.").

The Court concludes that the deposition testimony of these four witnesses, if credited, would not be sufficient for a reasonable trier of fact to find injury.

II.    TrueCar's Motion on the Issue of Materiality Is Denied.

As previously noted, to prove liability for false advertising under the Lanham Act, a plaintiff must establish that the challenged message was literally or impliedly false, and that the falsehood was material. Church & Dwight, 843 F.3d at 65. "If consumers, faced with the choice to purchase either the plaintiff's product or the defendant's, are likely to prefer the defendant's product by reason of the defendant's false advertising, the falsity of the defendant's advertising

is material to the plaintiff's Lanham Act claim." Id. at 71.  For the purposes of this motion, the literal falsity of TrueCar's ads are not in dispute.

In addition to moving for summary judgment on the issue of injury, TrueCar urges that no reasonable trier of fact could conclude that any false advertisements were material. It argues that "[a]s a matter of sheer logic the No Haggle Claim could not have influenced consumers' purchasing decisions."  (Def. Mem. at 14.)  According to TrueCar, there are two possible outcomes for a consumer who was exposed to the Company's "no-haggle" claims and attempted to purchase a vehicle with TrueCar: the consumer visited a TrueCar-affiliated dealer and did not end up buying a car, or else visited a TrueCar-affiliated dealership, negotiated, and bought a car despite the ads' false promise of a haggle-free experience.  (Id. at 14-15.)  In either event, TrueCar argues, any false advertisement did not ultimately affect consumer purchasing behavior.

TrueCar does not cite evidence to support of its description of consumer behavior, and for that reason alone has not met its burden as summary judgment movant.  Vt. Teddy Bear, 373 F.3d at 244.  Even if the scenario TrueCar describes is assumed to be accurate and complete, it describes a bait-and-switch transaction wherein a consumer is enticed to a dealership based on the prospect of a negotiation-free buying experience and guaranteed savings, only to be faced with negotiation and a different price than promised.  Rather than demonstrating that any false advertisement was immaterial, it describes consumer behavior that was manipulated by false advertisements, which sometimes led to a sale by a TrueCar-affiliated dealer.

TrueCar's motion for summary judgment on the issue of materiality is therefore denied.

III. Plaintiffs Have Come Forward with Evidence to Support the Disgorgement of TrueCar's Profits.

   A. Evidence of Injury Is Not Required to Order Disgorgement of Profits if the Record Demonstrates a Need for Deterrence.

Plaintiffs separately argue that even if they cannot demonstrate lost sales or harm to business reputation, thereby entitling them to compensatory damages for lost sales, their Lanham Act claim should proceed to trial on a disgorgement remedy. Plaintiffs urge that disgorgement should be ordered to deter TrueCar from falsely advertising in the future. Plaintiffs do not seek the disgorgement of TrueCar's profits as form of compensatory damages or as a remedy for unjust enrichment.

The Lanham Act provides that if a violation of its prohibition against false advertising has "been established in any civil action . . . the plaintiff shall be entitled . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C.A. § 1117(a). The Second Circuit has identified "three categorically distinct rationales" for ordering disgorgement of a defendant's profits: "The rule in this circuit has been that an accounting for profits is normally available 'only if the defendant is unjustly enriched, if the plaintiff sustained damages from the infringement, or if the accounting is necessary to deter a willful infringer from doing so again.'" George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1537 (2d Cir. 1992) (quoting Burndy Corp. v. Teledyne Industries, Inc., 748 F.2d 767, 772 (2d Cir. 1984)). "[U]nder any theory, a finding of defendant's willful deceptiveness is a prerequisite for awarding profits." Id.

As with damages to compensate a plaintiff's injury, the showing required for disgorgement varies somewhat with the facts of the case and the rationale for the remedy. When a plaintiff seeks disgorgement as compensatory damages or because the defendant was unjustly

enriched, the plaintiff must show injury.  George Basch, 968 F.2d at 1541 ("'an accounting based

on unjust enrichment is precluded'" where plaintiff "produced no evidence to suggest that the

infringement caused any sales diversion.") (quoting Burndy, 968 F.2d at 1541).

By contrast, disgorgement based on deterrence "is not compensatory in nature,

but rather seeks to protect the public at large." George Basch, 968 F.2d at 1539.  The accounting

and disgorgement of a defendant's profits "promote[s] the secondary effect of deterring public

fraud regarding the source and quality of consumer goods and services." Id.  The plaintiff "must

prove" that a defendant "acted with willful deception before the [defendant's] profits are

recoverable by way of an accounting." Id. at 1540.

The Second Circuit has repeatedly stated that disgorgement can be ordered if

there is evidence of a willful Lanham Act violation, even if the plaintiff has not demonstrated

that the violation caused injury.  In W.E. Bassett Co. v. Revlon, Inc., 435 F.2d 656, 664 (2d Cir.

1970), plaintiff did not establish at trial that the defendant's trademark infringement resulted in

lost sales or injury to good will.  Despite no showing of injury, the district court ordered a partial

accounting of defendant's profits based on the conclusion that defendant deliberately and

fraudulently infringed the plaintiff's mark.  Id.  The Second Circuit affirmed the remedy but

modified it to direct an accounting of all profits, explaining that "a full accounting is proper as a

deterrent" and that "the only way the courts can fashion a strong enough deterrent is to see to it

that a company found guilty of willful infringement shall lose all its profits from its use of the

infringing mark." Id. (emphasis in original).

In George Basch, the Second Circuit summarized W.E. Bassett as ordering an

accounting of full profits to advance deterrence "solely because" the defendant acted deliberately

and fraudulently.  968 F.2d at 1540.  In a later decision, the Second Circuit stated: "We have held

that an accounting for profits is available, even if a plaintiff cannot show actual injury or consumer confusion, 'if the accounting is necessary to deter a willful infringer from doing so again.'" Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., 146 F.3d 66, 72 (2d Cir. 1998) (quoting George Basch, 968 F.2d at 1537). It noted that "the decision whether to award a full or partial accounting must be based on what is necessary to deter future misconduct," and stated that "a district court has discretion to fashion an alternative remedy, or to award only a partial accounting, if the aims of equity would be better served." Id.

Most recently, Merck observed that "[o]ur precedent permits a district court to award a defendant's full profits based solely on deterrence." 760 F.3d at 262. After trial, then-District Judge Sullivan ordered the disgorgement of the defendant's profits based on "all three of the rationales" for disgorgement under the Lanham Act, and then trebled that sum. Merck Eprova AG v. Gnosis S.p.A., 901 F. Supp. 2d 436, 457-60 (S.D.N.Y. 2012). Judge Sullivan described defendant's "disdain for the law" as "nothing short of appalling" and concluded that a full accounting of profits was needed to prevent defendant from running false advertisements in the future. Id. at 458. The Second Circuit affirmed the remedy, including the trebling of the amount, based in part on the district court's findings that the defendant reaped "intangible benefits" from its false ads and because the full scope of plaintiff's damage was difficult to quantify. 760 F.3d at 262-63.

TrueCar argues that plaintiffs must demonstrate injury even on a deterrence-based claim, and points to language in Burndy stating that where a plaintiff failed to demonstrate injury for the defendant's false advertisements, "an accounting based on unjust enrichment is precluded." 748 F.2d at 773; see also George Basch, 968 F.2d at 1541 (quoting Burndy). However, Burndy's discussion of injury was specific to disgorgement as a remedy for unjust

enrichment.  George Basch, International Star and Merck, all of which post-date Burndy, acknowledged that in appropriate circumstances, disgorgement may be ordered to advance deterrence, even if plaintiff does not show actual injury.

The Court notes that while "a finding of willful deceptiveness is necessary in order to warrant an accounting for profits . . . it may not be sufficient."  George Basch, 968 F.2d at 1540.  "[T]he egregiousness of the fraud may, of its own, justify an accounting," but other factors to be weighed include "(1) the degree of certainty that the defendant benefited from the unlawful conduct; (2) availability and adequacy of other remedies; (3) the role of a particular defendant in effectuating the infringement; (4) plaintiff's laches; and (5) plaintiff's unclean hands."  Id.; see also Burndy, 748 F.2d at 774 (disgorgement of a defendant's profits "is rarely granted"); Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH, 2018 WL 4253181, at *17 (S.D.N.Y. Sept. 5, 2018) (declining to order disgorgement and noting that evidence of willfulness was "a far cry from the egregious conduct" at issue in Merck) (Nathan, J.); L & L Wings, Inc. v. Marco-Destin Inc., 756 F. Supp. 2d 359, 367 (S.D.N.Y. 2010) (concluding that "the equities weigh against" the accounting and disgorgement of defendant's profits where parties did not engage in direct competition, evidence did not establish that defendants conduct "led to any substantial additional profits" and such relief would "unjustly overcompensate" plaintiff) (Jones, J.).  Thus, even if plaintiffs can ultimately demonstrate TrueCar's willfulness at trial, additional considerations must guide the decision of whether a disgorgement remedy is appropriately ordered.

### B.  Plaintiffs Have Come Forward with Evidence that TrueCar Willfully Violated the Lanham Act's Prohibition Against False Advertising.

In opposition to TrueCar's motion, plaintiffs have come forward with evidence that, if credited, would permit a reasonable trier of fact to conclude that TrueCar willfully

disseminated false advertisements.  Any "<u>failure</u> to follow the advice of counsel . . . must factor into an assessment of . . . bad faith."  <u>Int'l Star Class</u>, 80 F.3d at 754 (emphasis in original).  The summary judgment record includes evidence that TrueCar acted against the advice of counsel in running advertisements that included the "no-haggle," "no-negotiation" claim, and that it was separately aware that its ads left consumers with a false impression about the process of purchasing a new vehicle through TrueCar.

In an e-mail of November 1, 2013, TrueCar's outside counsel, John Stephenson,[4] stated, "I strongly advise against using the phrase 'negotiation-free' in any form in our ads or other self-attributed public communications, for all the reasons Scott [Painter] and I have discussed.  In my view it is a much greater risk than we should bear at this point."  (Chudakoff Dec. Ex. 15B.)  Painter, the Company CEO, responded in part, "I am inclined to take some practical risk here."  (<u>Id.</u>)  In an e-mail of November 12, 2013, Stephenson noted that use of the phrase "negotiation free" "was over my objection, but that is an historical footnote that will hopefully be irrelevant over time . . . ."  (<u>Id.</u> Ex. 15D)  In his deposition, Stephenson agreed that it was "fair" to say that Painter approved the "negotiation-free" language over his objection. (Chudakoff Dec. Ex. 7 at 122-23.)

On November 18, 2013, Stephenson wrote an e-mail to Painter and others at TrueCar stating that "I do not believe we should talk about being 'negotiation free' in the present tense because we are not (both for the reasons we have debated at length and additionally because in nearly 20% of our jurisdictions we cannot even promise a guaranteed savings, meaning in those states nothing about the experience is 'negotiation-free'.)"  (Chudakoff Dec. Ex. 15G.)  Stephenson advised that the phrase "no hassle" was acceptable, but that "[n]o haggle

---

[4] Stephenson is also described by plaintiffs as the Company's "Chief Risk Officer."  (Pl. 56.1 ¶ 73.)  In the e-mails discussed herein, Stephenson was writing from a law firm e-mail address.

should not be used" because TrueCar could not assure users that they would not be expected to bargain about price and because consumers would believe that TrueCar would take an "active role" in arranging for sales terms. (Chudakoff Dec. Ex. 15A.)

TrueCar continued not to follow Stephenson's advice when he raised concerns about the "negotiation-free" claim, and he observed in a February 24, 2014 e-mail that "Scott [Painter] may have decided to take these risks over my objection, which is his province . . . ." (Chudakoff Dec. Ex. 15F.)

Plaintiffs also point to evidence that TrueCar internally was aware that the Company website was not facilitating sales in the manner promised by TrueCar. Thomas Taira, the Company's Chief Product Officer, stated in a November 14, 2013 e-mail to Painter, the CEO, that customers were using TrueCar to "configure a virtual vehicle that has less than a 2% chance of existing on a dealer's lot." (Chudakoff Dec. Ex. 10A.) The same e-mail stated that "when we send in our prospects with a certificate of a bullshit virtual vehicle, we don't arm them with the proper tools to ensure they know we have their back at the most critical moment." (Id.) In his deposition, Taira stated that the 2% figure was "not a factual number" and was "more emotion." (Weinberger Reply Dec. Ex. 6.)

Separately, in a November 2013 presentation, a TrueCar executive noted a consumer survey finding that 80% of survey consumers stated that TrueCar-affiliated dealers did not honor the "Guaranteed Savings" certificate. (Pl. 56.1 ¶ 69; Def. 56.1 Resp. ¶ 69.)

As to the "TrueCar Curve" and its reference to a factory invoice price, there is also evidence that TrueCar acted against the advice of counsel in listing a factory invoice price. An internal TrueCar e-mail of April 22, 2015 states in part: "One note on graphics: per legal and Council guidance- we will not have ANY on screen mention of 'Factory Invoice' on the Curve."

(Chudakoff Dec. Ex. 15C.)  The record also includes an e-mail sent to TrueCar by Earl Stewart of Earl Stewart Toyota, a TrueCar-affiliated dealership that was active in an advisory committee called the "TrueCar dealer council."  (Donat Dep. 195; Chudakoff Dec. Ex. 12E.)  That e-mail explained that certain manufacturers "strictly prohibited" their dealerships "from advertising a price below dealer invoice" as a way "to prevent 'bait and switch' advertisements."  (Id.)  It stated, "Many car buyers believe that the dealer invoice is the true cost of the car; it is not."  (Id.)

TrueCar has pointed to certain evidence that may weigh against a finding of willfulness.  TrueCar stopped running the disputed advertisements on or about March 27, 2016.  (Def. 56.1 ¶ 18; Pl. 56.1 ¶ 18.)  The TrueCar homepage included a disclaimer stating that "[e]ach dealer sets its own pricing.  Your actual purchase price is negotiated between you and the dealer."  (Pl. 56.1 ¶ 40; Def. 56.1 Resp. ¶ 40.)  Although TrueCar's chief marketing officer has described the text as "mouse print," the disclaimer is some evidence that TrueCar qualified its "negotiation-free" claim on its homepage.  (Pl. 56.1 ¶ 41; Def. 56.1 Resp. ¶ 41.)

TrueCar also urges that disgorgement of its profits is not an available remedy because TrueCar did not profit from is advertisements, meaning that "there are no profits to disgorge."  (Reply Mem. at 8.)  It explains that during the relevant period, after accounting for its operating expenses, TrueCar had negative profits associated with each new-car sale.  (Def. 56.1 ¶ 33; Pl. 56.1 ¶ 33.)  A court of equity has considerable discretion in deciding whether operating expenses during a start-up period ought to be netted against profits in a later period.  Accepting the truth of this assertion, the extent of TrueCar's profits after expenses may be afforded some weight in determining the scope and/or appropriateness of a disgorgement remedy, but it is not evidence that entitles TrueCar to summary judgment.

Drawing every reasonable inference in favor of the plaintiffs as non-movants, the decision of TrueCar's officers to ignore counsel's warnings about the "negotiation-free," "haggle-free" claims is evidence that TrueCar willfully misrepresented the services that it would provide to consumers in the car-buying process. There is also evidence that the "TrueCar Curve" incorporated information about factory invoice price against the advice of counsel. TrueCar's internal communications are also evidence that TrueCar knew that the "Guaranteed Savings" certificate would not provide consumers with the vehicle of the make and model of their choosing at a guaranteed price. This evidence would permit a reasonable trier of fact to conclude that TrueCar willfully violated the Lanham Act's prohibition against false advertising. To the extent that there is countervailing evidence that TrueCar's conduct was not willful and that it did not profit from the advertisements, those arguments are appropriately weighed by the Court sitting in equity, but they do not entitle TrueCar to summary judgment.

TrueCar's summary judgment motion is therefore denied to the extent that plaintiffs seek the disgorgement of TrueCar's profits on the grounds of deterrence. To the extent that plaintiffs also urge that injunctive relief and corrective advertising is warranted, such additional relief may be considered by the Court in the exercise of its equitable powers.

IV.     Plaintiffs' State Law Claims Are Stayed.

As noted, in addition to the federal Lanham Act claim, the Complaint brings claims under New York common law and its General Business Law, as well as "other comparable state laws." The Complaint invokes federal question jurisdiction and the Court's supplemental jurisdiction, and does not invoke diversity jurisdiction. By the Court's count, the 108 plaintiff dealerships are located in 23 different states.

The parties' summary judgment filings do not address the state law claims. Plaintiffs' opposition memo states only that they are "entitled to a trial on liability and remaining remedies available under the Lanham Act and related state law," (Opp. Mem. at 1) and TrueCar's memoranda do not specifically discuss any state law claim.

Plaintiffs' state law claims will be stayed, pending resolution of plaintiffs' Lanham Act disgorgement claim.

CONCLUSION.

For the reasons explained, TrueCar's motion for summary judgment is granted in part and denied in part. The Clerk is directed to terminate the motion. (Docket # 103.)

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
       March 27, 2019